**FAIRMONT FOODS COMPANY,**
Appellant,

v.

**Clifford M. HARDIN, Secretary of Agriculture.**

No. 23808.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 24, 1970.

Decided Feb. 3, 1971.

As Amended Feb. 26, 1971.

---

Mr. Milton Eisenberg, Washington, D. C., for appellant.

Mr. Walter H. Fleischer, Atty., Department of Justice, with whom Thomas A. Flannery, U. S. Atty., and Alan S. Rosenthal, Atty., Department of Justice, were on the brief, for appellee.

Before TAMM, LEVENTHAL and WILKEY, Circuit Judges.

LEVENTHAL, Circuit Judge:

This action was brought by the appellant Fairmont Foods to obtain review of a decision of the Secretary of Agriculture upholding the validity of a location differential provision of the Federal Milk Marketing Order for the Nebraska—Western Iowa Marketing area, 7 C.F.R. § 1065.51 (1965). The District Court sustained the Secretary's motion for summary judgment. We reverse.

## I. The General Regulatory Scheme

Although the mechanics of milk regulation have been described elsewhere,[1] a brief review of the regulatory scheme will provide a helpful background for consideration of the issues raised by this appeal.

The Agricultural Marketing Agreement Act of 1937 as amended 7 U.S.C. § 601 et seq. (1964), places upon the Secretary of Agriculture primary responsibility for establishing and maintaining "such orderly marketing conditions for agricultural commodities in interstate commerce as will establish, as the prices to farmers, parity prices * * *."[2] The Secretary is thus authorized to issue orders regulating the handling of milk and other commodities. Under the Act, any handler of milk subject to an order may file a written petition with the Secretary of Agriculture for administrative review of the order.[3] The decision of the Secretary on such petition is subject to judicial review in the District Court.[4]

Section 8c(5) (A) of the Act provides for the classification of milk according to the way in which it is used, and for the establishment of minimum prices to be paid for each class of milk by handlers.[5] In a market-wide pooling order such as the Nebraska-Western Iowa Order involved here, the handlers do not pay these class prices directly to individual producers. Instead, each handler pays the producers with whom he deals a uniform or "blend" price based upon the way milk is used by all handlers throughout the marketing area—that is, how much in fluid form and how much in the various manufactured forms, such as cheese. To take account of the discrepancy between the uniform blend price and the different use value of milk to a particular handler a "producer settlement fund" is established.[6] A handler whose use of milk in high-value Class I (fluid milk) form is more than average in the market must pay into the producer settlement fund; a handler whose Class I usage is lower than average receives payment from the fund so that he can pay his producers the blend price.

The price payable for each use classification in a particular milk order must, according to the Act, be "uniform as to all handlers."[7] The uniform price is subject to three (and only three) adjustments—namely for

"(1) volume, market, and production differentials customarily applied by the handlers subject to such order, (2) the grade or quality of the milk purchased, and (3) the locations at which delivery of such milk, or any use classification thereof, is made to such handlers."[8]

It is the third adjustment, or "location differential," which is involved in this appeal.

## II. The Marketing Order and the Secretary's Decision

On July 15, 1964, notice was given that the Department of Agriculture would hold a hearing on several proposed amendments to Milk Order No. 65, Milk in the Nebraska-Western Iowa Marketing Area.[9] The Notice of Hearing included three amendments proposed by the Nebraska-Iowa Nonstock Cooperative Milk Association, hereafter Coop. The first proposed an enlargement of the marketing area to include the entire Nebraska panhandle, the eleven western counties of Nebraska to be designated as the Western Zone, the previous area covered by the Order to be designated as the Eastern and Central Zones. The second proposal related to Section 1065.51 of the

---

1. See, e. g., H. P. Hood & Sons, Inc. v. United States, 307 U.S. 588, 59 S.Ct. 1019, 83 L.Ed. 1478 (1939).

2. 7 U.S.C. § 602(1) (1964).

3. 7 U.S.C. § 608c(15) (A) (1964).

4. 7 U.S.C. § 608c(15) (B) (1964).

5. 7 U.S.C. § 608c(5) (A) (1964).

6. 7 C.F.R. § 1065.81.

7. 7 U.S.C. § 608c(5) (A) (1964).

8. Id.

9. 29 Fed.Reg. 9802.

Order,[10] which at that time provided a uniform Class I price consisting of the basic formula price plus $1.40 per cwt. The second amendment proposed to make that price applicable to the expanded marketing area. The third proposal related to Section 1065.53 of the Order,[11] which at that time provided for location adjustments to handlers for milk received from producers at a pool plant located more than 80 miles from certain designated cities. The third amendment proposed a new section, "Location Adjustments to Handlers," which would retain the previous provision, and further provide that the price computed in § 1065.51 (a) shall be increased 15 cents on all milk received from producers at plants located in the Central Zone and increased 40 cents on all milk received from producers at plants located in the Western Zone.

The Department's decision and Amending Order,[12] issued February 4, 1965, by Assistant Secretary George Mehren, took these actions: First it designated the area already covered by Order 65 as the Eastern and Central Zones, and added the eleven counties of the panhandle, which were designated as the Western Zone. As to the second and third proposals, the technique set forth in the Amending Order was a revision in the Class I price provisions of the Order whereby the Class I differential over the formula price was held at $1.40 per cwt. for pool plants in the Eastern Zone, and was increased to $1.55 for plants in the Central Zone, and to $1.80 for plants in the Western Zone.[13] The Secretary's decision, which set forth findings and conclusions, contains in section 6, "Class I price," a discussion of the reasons for the 15 cent and 40 cent increases in minimum Class I price, (above the base price for plants in the Eastern Zone) in the case of milk delivered to plants in the Central and Western Zones, respectively.

The Secretary's decision was based on two factors. The first was the need to reflect "the cost of moving milk [to the Central and Western Zones] from the areas where supplemental supplies must be obtained" (i. e., from the receiving station at Grand Island, in the Eastern Zone, or from Minnesota and Wisconsin).

The second reason cited by the Secretary in support of these differentials was the need for a proper alignment of the uniform price with the prices of competing markets. The markets referred to are the Eastern Colorado and Black Hills areas, which are regulated under other Orders.[14]

Following the promulgation hearing, Fairmont filed a petition for administrative review with the Secretary of Agriculture. The Judicial Officer to whom the Secretary delegated authority adopted verbatim the findings of fact in the 1965 Decision accompanying the Amending Order, and dismissed Fairmont's objections to the Amending Order. The opinion of the Judicial Officer expanded somewhat on the first ground of decision in the Amending Order, that relating to supply shortages in the Central and Western Zones. He viewed these deficits as part of a broader pattern, wherein milk supplies grew generally shorter as one proceeded west from the Minnesota-Wisconsin dairy complex. As a result, "milk has an increased value as it moves west from the areas of surplus production, that is, Minnesota and Wisconsin, and * * * while there are seasonal surpluses of milk in the Western and Central Zones, to some extent supplemental supplies are imported into the Central and Western Zones." [15]

Fairmont filed a complaint in the District Court on November 3, 1967, seeking judicial review of the Department's decision, as well as injunctive, declaratory

---

10. 7 C.F.R. § 1065.51.

11. 7 C.F.R. § 1065.53.

12. 30 Fed.Reg. 1857.

13. 7 C.F.R. § 1065.51(a) (Rev. Jan. 1, 1966).

14. 7 C.F.R. § 1137 (Eastern Colorado) ; 7 C.F.R. § 1075 (Black Hills).

15. In re Fairmont Foods, AMA Docket No. 65–1, at 17.

and monetary relief.[16] Thereafter both parties moved for summary judgment, and on October 1, 1969, the District Court entered an order granting the Government's motion and denying Fairmont's. This appeal followed.

III. *The Requirement that Findings of the Secretary Justify Differentials From the Uniform Prices in Minimum Milk Price Orders By Reference to the Limited Grounds Authorized by Congress*

■ In assessing the validity of these differentials, it is important to keep in mind the limited scope of authority that Congress delegated to the Secretary in the field of milk marketing regulations. This is not a case where the power of an agency or officer is bounded only by the broad Congressional mandate that it be exercised in the "public interest." As emphasized by recent court decisions,[17] the text and legislative history of this statute [18] make it plain that the Secretary was required to operate within the narrow confines of powers expressly granted. In any milk order he was required to set uniform minimum prices payable by handlers subject to the order. He was authorized to make only certain adjustments and these were to "compensate *or reward the producer for providing an economic service of benefit to the handler."* [19]

■ On judicial review, it is the function of the court to assure that the Secretary has set forth findings and reasons which fully justify any differential from the uniform price,—and justify them on the limited grounds permitted by Congress, which allow increases in minimum prices to reflect economic service of benefit to handlers. (It may be interpolated that the orders did not preclude handlers from entering into private contracts to pay their suppliers for additional benefits through prices higher than the minimum prices required by the Government's order.) The court must invalidate orders resting on any basis other than such economic reasons,—whether the orders are ascribable to whim, which seems unlikely; or to response to the influence of major farm interests, which may be more likely; or merely bureaucratic error in supposing that the wisdom of experts as to what is needed in the public interest must be given dominance over the constraint of Congress.

The pertinent principles are appropriately developed by close attention to the Supreme Court's *Zuber* opinion. *Zuber* involved an Order requiring handlers to pay producers located at certain distances from the marketing area—"nearby farmers"—higher prices than are paid to producers located at greater distances from such areas. Having abandoned the attempt to justify these differentials as "location adjustments," which had failed in this court,[20] the Government tried to fit them within the scope of "market * * * differentials customarily applied by the handlers." [21] The Court noted that the Congressional purpose behind allowing these differentials is "illumined by the character of the other statutory differentials for 'volume,' 'grade or qual-

16. As monetary relief, Fairmont seeks a judgment directing the Secretary to cause to be refunded to Fairmont all overpayments made by it under Milk Order 65 as a result of the differentials. It should be noted that the Order was amended again in 1968, and the Nebraska zones were substantially altered. 33 Fed.Reg. 6624. Thus this case involves only the amounts that Fairmont was obligated to pay from 1965 to 1968.

17. Zuber v. Allen, 396 U.S. 168, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969); Blair v. Freeman, 125 U.S.App.D.C. 207, 370 F. 2d 229 (1966).

18. Congress wrote the act with narrow standards to avoid any possible claim of unconstitutional delegation of legislative power grounded on the 1935 decisions of the Supreme Court. H.R.Rep.No.1241, 74th Cong., 1st Sess. (1935).

19. Zuber v. Allen, *supra*, 396 U.S. at 184, 90 S.Ct. at 323.

20. Zuber v. Allen, 131 U.S.App.D.C. 109, 402 F.2d 660 (1968).

21. 7 U.S.C. § 608c(5) (B) (1964).

ity,' 'location,' and 'production,' all of which compensate or reward the producer for providing an economic service of benefit to the handler." [22] Since the Secretary failed to advance sufficient justification for the nearby differentials in terms of economic service of benefit to handlers, the Court concluded that they fell outside the scope of his authority and were therefore invalid.

To summarize and emphasize, the regulatory scheme results in uniformity among the handlers covered by a milk marketing order, with additional economic burdens being permitted only for economic reasons, to "compensate or reward the producer for providing an economic service of benefit to the handler." *Zuber, supra,* at 184, 90 S.Ct. at 323. This is a sound objective of governmental regulation, and one which the courts are and should be vigilant to preserve. It is for that reason that *Zuber* requires the Secretary to demonstrate, as a prerequisite to imposing the burden of price differentials on handlers, that the burden is imposed for the purpose of reflecting an economic service of benefit to the handler.[23]

## IV. The Secretary's Decision and Order Do Not Justify the Additional Burdens Placed on Handlers in the Central and Western Zones of Nebraska

██ ██ We conclude that the differentials at issue here fail to meet the pertinent tests. We can find no substantial evidence of record to support the Secretary's findings, either (a) as to milk deficits and movements within Nebraska, or (b) as to market disruptions in the neighboring market subject to the Colorado Order. Absent such evidence of economic service of benefit to the handler, the differentials in this Order have not been supported with justification required under the statute.

### A. Contention of Justification in Terms of Deficits Within Nebraska

The first premise of Assistant Secretary Mehren for justification of these differentials was that supplemental milk is needed in the Central and Western Zones, at least in the months of short supply. He found that the differentials in the Order reflect the cost of moving supplemental milk from the Eastern Zone to the Central and Western Zone plants, and also reflect the incremental cost of these zones, over and above the Eastern Zone, in receiving imports from Minnesota and Wisconsin.[24]

The Judicial Officer used a broader frame of reference for upholding the order, stating that the market area as a whole was a deficit market requiring imports of milk from the Minnesota-Wisconsin region, that milk has increased value as it moves westward from the surplus area of Minnesota and Wisconsin, and that while there are seasonal surpluses in the Central and Western Zones to some extent supplemental supplies are imported into these zones.

Thus the Agriculture officials painted Western and Central Nebraska as an area of short milk supply. When we study the record it becomes plain that whereas the national pattern for milk includes a volume moving west from Minnesota-Wisconsin, within the state of Nebraska the basic pattern of milk supplies is from west to east—a kind of localized cross-current that is traverse to the national movement of milk westward from Wisconsin. The Secretary may

---

22. 396 U.S. at 183–184, 90 S.Ct. at 323.

23. The Secretary argues, among other things, that the differentials set by this Order are based on the "locations at which delivery * * * is made to * * * handlers," and thus fit within the literal definition of a location adjustment permitted by the Act. 7 U.S.C. § 608c(5) (A) (3). We cannot agree,

however, that a mere difference in location is sufficient reason to require one handler to pay higher prices than another governed by the same Order. There must still be some relation between the price differential and economic benefit.

24. The pertinent paragraphs in his findings appear at 30 Fed.Reg. 1857, 1861.

take account of large trends and flows when formulating regulatory policies. Where, however, the specific area covered by a local milk marketing order is fairly characterized by a different trend, the regulation and its justification must take full account of the local movement.

What is involved in the Secretary's first justification of the Order before us is the movement of raw milk before it is processed, not the distribution of processed milk by the handler into the consumer market. And while raw milk is imported into Nebraska from the Minnesota-Wisconsin complex,[25] the exhibits in the record of the promulgation hearing show that within Nebraska itself the dominant movement of raw milk is eastward from the Central and Western Zones (sometimes referred to together as the "western zones"), and there is no significant movement of milk westward to these western zones. We refer particularly to the data for 1963, as presented by the Coop itself in Exhibits 28 and 29. More than 11 million pounds of milk were transferred from the Central Zone (North Platte) to the Eastern Zone (Grand Island), while only 222,000 pounds were transferred from the Eastern to the Central Zone. More than 2 million pounds were shipped from the Western Zone (Scottsbluff) to the east, and *no milk* was transferred to the Western Zone. The data for 1964 in these exhibits follow the same pattern.[26]

To the extent that milk is shipped westward from the Eastern Zone the shipments do not go to the western zones of Nebraska (except for a relatively small offset to the Central Zone), but are movements that go almost entirely to Denver. Two salient conclusions emerge. First, the Central and Western Zones are essentially areas of raw milk surplus, not deficit. The Coop found it necessary to return very little raw milk to those areas from the Grand Island station.[27] Second, even if there is occasional deficit in the western zones, it is due primarily to the fact that the Coop, for its own reasons, has first moved raw milk eastward from the Central and Western Zones into Grand Island and

25. The record discloses that the Nebraska Coop at one and the same time ships milk westward (largely to Denver) and satisfies Nebraska demand by importing milk from states to the east. Mr. Grant, the Coop's chief witness, testified at least three times at the promulgation hearing regarding these imports from the east. (Tr. 25, 59–60, 210). Even Mr. Rasey, Fairmont's chief witness, conceded that "because of economic factors involved it is better for the Association to ship into Denver at Class I prices and import milk east of the normal production area in order to supply handlers in the eastern end of the state." (Tr. 304).

26. Exhibits 28 and 29 contain data for the first six months of 1964. During that period, more than 5.3 million pounds of raw milk were shipped from the Central to the Eastern Zone, while only 400,000 were shipped from the Eastern to the Central Zone. Transfers from the Western to the Eastern Zone totalled more than 900,000 pounds, while transfers from the Eastern to the Western Zone were zero.

27. Mr. Grant, the Coop's chief witness, himself testified that although Fairmont Foods at Mitchell (Western Zone) pur-

chased all of its supplies from the Coop, this milk came from the 34 Coop members located in the Western Zone (Tr. 32). "Normally," according to Grant, "the local producers would be of sufficient supply to handle it. To my knowledge once or twice we may have supplemented it from producers at North Platte [in the Central Zone]." (Tr. 32–3). Mr. Grant also testified that three of the six non-Coop producers in the Western Zone supplied the Kimball Dairy at Kimball, Nebraska, and that this dairy supplemented its supplies through purchases from the Coop. But when asked where these supplements came from, Mr. Grant replied that they were sold by the 34 Western Zone members of the Coop (Tr. 33), indicating that Kimball Dairy too was able to meet its need solely through farmers located in the Western Zone. Mr. Grant also testified that the milk transferred from Scottsbluff to Grand Island was "not needed in the western section of the state." (Tr. 207). Mr. Rasey, who represented Fairmont, stated that milk receipts from producers in Lincoln, Keith and Perkins Counties (all in the Central Zone) were sufficient to supply the Fairmont plant at North Platte, also in the Central Zone.

then moved milk westward into Denver.[28] The basic movement in Nebraska, however, remains eastward.[29]

The Government argues that the need for supplemental milk supplies in the western zones is evident from the fact of imports of milk into Nebraska from the east. But the record shows that while 11.4 million pounds were imported into Nebraska in 1963, 7.1 million were exported to Denver, yielding a net import into Nebraska of about 4.3 million pounds for that year (Ex. 30). Assuming that *all* of this milk was transferred westward to the western zones, it is only one-third as great as the 12.9 million net pounds transferred in 1963 from the western zones to the Eastern Zone. The conclusion is inescapable that the imports were not needed to supply handlers in the Central and Western Zones, but rather to fill the requirements of handlers located in the Eastern Zone. This was the testimony of Fairmont's witness (Rasey, Tr. 304), it is supported by the data, and no contrary explanation appears in the testimony of any other witness.

We move from the annual data to consider the possibility that in some months of the year handlers in the western zones will run short of raw milk. We see that even in September, 1963, when net imports into Nebraska reached their monthly high of 1.2 million pounds (Ex. 30), there was still a net transfer to the Eastern Zone *from* the Central Zone of 395,000 pounds, and *from* the Western Zone of 175,000 pounds. These facts establish that imports from other states were for the benefit of handlers in the Eastern Zone, not the western zones. Although the record does not isolate demand and supply for the Eastern Zone, it is plain that month by month the handlers in the Eastern Zone require milk movements into that Zone to meet their needs, and at least part of these needs is satisfied by transfers from the western zones of Nebraska.[30] In short, the Eastern Zone of Nebraska is a deficit area. The Department's conclusion that the

28. Mr. Grant himself testified that the shipment of milk from Grand Island to Fairmont's plant at North Platte was at least partly due to the diversion into Denver of supplies obtained from Western Zone producers. (Tr. 205).

29. We are completely unpersuaded by the effort to refute this proposition which appears in the Government Brief (p. 12) as follows:

"Fairmont appears to assert that the conclusion to be drawn * * * is that fluid milk moves from West to East in Nebraska. * * * Instead such milk often was either being gathered for shipment West to Colorado (Tr. 211), or to be sent to the cooperative's manufacturing plant. In 1963, about 12,000,000 pounds of milk were transferred from the Grand Island plant to the Norfolk manufacturing plant * * *"

As to the milk moving from the western zones to Grand Island and then to the Norfolk plant, this is definitely a move eastward (Norfolk being in the Eastern Zone, and indeed east of Grand Island).

As to the milk moving from the western zones to Grand Island and then west to Colorado, this characteristic of the months of surplus (Govt. Br. 10) does not offset the fact that during this period the movement within Nebraska is eastward. Thus, October was the peak month in 1963 of shipments from Nebraska to Colorado (2,063,470 pounds). In that same month transfers from the Central to Eastern Zone (808,232 pounds) far exceeded transfers from Eastern to Central (14,361); and transfers from the Western to Eastern Zone (147,583 pounds) were not offset by any shipments to the Western Zone.

30. Month by month, the total amount of raw milk entering the Eastern Zone, both from the western zones of Nebraska and from Minnesota-Wisconsin, exceeded the total amount of raw milk shipped from the Eastern Zone, both to Denver and to the western zones. For example, in November, 1963, while exports from Grand Island to Denver exceeded imports to the Eastern Zone from Minnesota-Wisconsin by almost 660,000 pounds, the net shipments to Grand Island from the western zones totalled about 1,040,000 pounds. Thus even in that month, the handlers in the Eastern Zone, including the Coop and its manufacturing plant, appear to have required 380,000 pounds of raw milk from elsewhere to meet their needs.

western zones are a deficit area is not only unsupported by any data isolating demand and supply for the western zones, —an omission which, in context, is not without importance,—but is simply not supported by any substantial evidence whatever in the record before the court.

If there is a slight deficit in the western zones on occasion, due to the Coop's desire to take advantage of the higher Colorado prices, that does not warrant deviation from the uniform price payable by handlers, which the Act contemplates as the norm for milk marketing orders. For these exceptional situations, the Western and Central Zone handlers can pay higher prices on a private contract basis. But there is no reason to impose on these handlers a requirement to pay a higher premium price all year around, and thereby put them at a severe disadvantage vis-a-vis their competitors handling milk in the Eastern Zone, on the theory that there is a general westward milk movement in Nebraska, when in fact the predominant movement in Nebraska is eastward.[31]

We have undertaken this rather detailed evidentiary review because it is with diffidence that we hold that the Secretary's first ground of decision is not supported by substantial evidence on the record. Yet that is the only conclusion that we think can fairly be reached on this record. The Secretary's observation that *milk supplies generally move* westward from Wisconsin and Minnesota does not establish that handlers in the western zones of Nebraska are dependent for their supplies of raw milk on producers in the Eastern Zone of that state. On the contrary, what this record shows is that farmers in western Nebraska are able themselves to meet the needs of handlers in western Nebraska, and if they do not do so, it is because their own Coop insists that they first ship their milk eastward to a receiving station in eastern Nebraska. While normally the court defers to administrative expertise, the record is so devoid of support for the Secretary's finding with respect to milk supplies and movements in Nebraska that the finding cannot be allowed to stand.

B. *Contention of Relationship to Colorado Milk Order*

■ This brings us to the second ground of the Secretary's decision, that price differences, when prices are compared to those set in orders for adjacent regions, necessitate the imposition of price differentials in the Nebraska order in order to avoid serious disruptions in the markets of adjoining regions. As contrasted with his first ground of decision, the Secretary here is focusing not on the distribution of raw milk *to* the handler, but rather the marketing of the finished product *by* the handler.

At the outset we observe that even if we were to uphold the Secretary's findings on the second ground, we cannot say that his error as to the first would necessarily be immaterial. It is not clear that the Secretary would have "made the same ultimate finding with the erroneous findings or inferences removed from the picture." NLRB v. Reed & Prince Mfg. Co., 205 F.2d 131, 139 (1st Cir.), cert. denied, 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391 (1953). See also Braniff Airways, Inc. v. CAB, 126 U.S.App.D.C. 399, 379 F.2d 453 (1967). The Secretary's decision to rem-

---

31. Appellant argues that a western movement within Nebraska, even if proved, would not justify the imposition of these differentials, on the theory that a location differential must reflect not merely some economic benefit to the handler, but a particular kind of benefit—namely the transportation costs saved by the handler when the producer delivers the raw milk supplies near the prime marketing area. Since, according to appellant, the major Nebraska markets, like Omaha, are in the Eastern Zone, it is the Eastern, not Central and Western handlers who should pay the location differentials. We need not reach that question, since we are satisfied that there is no substantial westward movement within Nebraska in the first place.

edy the market situation in Eastern Colorado through price differentials in Nebraska, may have been materially influenced by the arguments and his conclusion that these differentials would serve at the same time to remedy the milk deficit he had concluded existed in the western zones. Had the latter problem been removed from consideration the Secretary might well have chosen to solve the former by using the more refined technique of compensatory payments within the Eastern Colorado Order itself. That possibility would have had to be explored on remand.

We need not pause long over the problem, since we find that the Secretary's second ground, like the first, is unsupported by the record. The requirement of substantial evidence supporting salient findings is particularly important here, where the Secretary has chosen a broad rather than refined remedy as a means of solving the alleged problem of market disruptions in Eastern Colorado. In seeking to handle this problem through the Nebraska-Western Iowa Order, the Secretary has imposed the burden of higher prices on all handlers receiving milk within the Central and Western Zones, whether or not they intend to market that milk in Colorado. As an alternative, the Secretary could have added to the Eastern Colorado Order a requirement that handlers pay a compensatory charge on all milk purchased from producers outside the area and marketed within it. In that case the handlers would have had to bear the burden only if and when they entered the Colorado markets.[32]

Such a change in the Colorado Order, reflecting the handler's competitive advantage from the purchase of "outside" milk, would be valid.

In Lehigh Valley Coop. Farmers v. United States[33] the Supreme Court invalidated a provision in the New York-New Jersey Order for compensatory payments, payable to the pool's producers by a handler who brought outside milk into the area for fluid consumption. The Court did not say that compensatory charges are invalid per se, but only that the charge at issue bore no relation to the handler's competitive advantage.[34] The Court was careful to say: "As has been pointed out (note 13, *supra*), there are other means available [to put handlers of pool and non-pool milk on a competitive par], while affording protection to pool producers, without imposing almost insuperable trade restrictions on the entry of nonpool milk into a marketing area."[35] Note 13, referred to by the Court, listed several means of calculating the compensatory payment, including the difference between the Class I Order price and the actual cost to the handler of the nonpool milk. We conclude that the Third Circuit was sound in concluding that *Lehigh Valley* "did not strike down all compensatory payments, rather

---

32. Indeed if a particular handler distributed a high enough percentage of his milk in Eastern Colorado, he would be subject to being "regulated" under that order, and in that event the Secretary could require that handler to pay the minimum prices set by the Eastern Colorado Order for all Class I milk purchased by him, including milk which he did not distribute in Eastern Colorado. *See* Lewes Dairy v. Freeman, 401 F.2d 308 (3d Cir. 1968), cert. denied, 394 U.S. 929, 89 S.Ct. 1187, 22 L.Ed.2d 455 (1969).
We need not consider whether *Lewes Dairy* was rightly decided on its facts.

We take it as obvious that at some point a handler may be so substantially, or perhaps predominantly, identified with a marketing area as to be subject to complete regulation under the order for that area.

33. 370 U.S. 76, 82 S.Ct. 1168, 8 L.Ed.2d 345 (1962).

34. The provision called for payment of an amount equal to the difference between Class I and Class III prices prevailing under the Order for the same volume of milk.

35. 370 U.S. at 98, 82 S.Ct. at 1180.

it found that the particular rate of payment involved therein was invalid."[36]

We are not required to consider whether, as one court seems to have held,[37] the Secretary is forbidden from preventing market disruptions in one market by inserting differentials in the order governing another market. But we do think that his use of a requirement that is more burdensome and less refined than an available alternative requires very careful scrutiny of the evidence relied on as a basis for his findings. "[T]he use of a sweeping rather than a more refined administrative remedy may, at least in some instances, represent an improvident use of administrative discretion, in the absence of stated justification. Burlington Truck Lines v. United States, 371 U.S. 156, 173–174, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)." Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. ——, at ——, 444 F.2d 841, at 861 (November 13, 1970).

Assuming that the Nebraska-Western Iowa Order is a proper vehicle for remedying market disruptions in the Eastern Colorado market, there must be substantial evidence of such disruption in order to justify the imposition of such price differentials for this purpose. Mere speculation is no warrant for deviating from a principle as paramount as that of uniform price structure within a single order, particularly where the Secretary has other techniques available.

We can find no basis for the Secretary's findings beyond mere speculation, and therefore conclude that his second ground of decision, like the first, must fail. The crucial fact emerging from the testimony at the promulgation hearing is that while there was very little milk sold by Nebraska handlers in Colorado, Colorado handlers accounted for a substantial share of milk marketing in western Nebraska. Mr. Grant, for example, testified that he knew of no sales by any Nebraska handlers in Colorado, except for Fairmont's small contract with the Sterling, Colorado, public schools. (Tr. 232–33). On the other hand, Mr. Grant estimated that 3 out of 10 handlers operating in the Western Zone of Nebraska, were regulated under the Eastern Colorado Order. (Tr. 52–3). Mr. Davidson, who also testified in favor of the Order, stated that Colorado handlers, specifically Beatrice, Safeway, and Borden were selling in western Nebraska. In fact he admitted that the "only area of competition * * * between eastern Colorado handlers and those regulated under the present Nebraska-Western Iowa order would be in the [Nebraska] panhandle area." (Tr. 269).

■ The Secretary does not deny these facts, and attempts to cope with them by arguing that he should be allowed to prevent market disruption before it actually occurs. Administrative and executive expertise certainly encompasses some powers of prediction not shared by those less familiar with the intricacies of the particular field, but such powers, like any others, must be justified by reference to objective evidence. There must be a rational basis of record for invoking the concept of a preventative remedy. We think that the Secretary failed to meet that standard. The record offers nothing but generalizations of broad westward movements, and these do not support the inference that there will be specific movements of processed milk from western Nebraska to eastern Colorado when these have not taken place in the past, and indeed the movement has gone from Colorado to western Nebraska. Assuming that intra-Order differentials may constitute a proper means of dealing with dislocations between western Nebraska and eastern Colorado, there was insufficient need in this case for their application.

36. *Lewes Dairy, Inc. v. Freeman*, 401 F. 2d 308, 314 (3rd Cir. 1968), cert. denied, 394 U.S. 929, 89 S.Ct. 1187, 22 L.Ed.2d 455 (1969).

37. *Sunny Hill Farms Dairy Co. v. Freeman*, 307 F.Supp. 392 (E.D.Mo.1969).

## V. *Remedy*

There remains the problem of remedy.[38] Since, as noted earlier,[39] the Order under review was replaced in 1968 by a new Order, no prayer for injunction need be considered. As to damages, we think that Fairmont is entitled to recover overpayments which it made pursuant to this invalid Order. The Secretary argues that had the invalidity of this Order been apparent at the time, he would have chosen to replace the differentials with a single Order price, one which would have been *higher* than the 1965 Eastern Zone price. Thus, according to the Secretary, not all, if any, of Fairmont's payments above the Eastern price can be considered overpayments subject to refund. This argument, based as it is on mere conjecture and supposition, ignores the fact that such alternative measures were not utilized, that the Secretary in fact assumed that his Order was valid and imposed the price differentials on the basis of that assumption. We are not persuaded by the argument that had Fairmont not been required to pay a differential, it might have been required to pay the same price anyway as a result of some alternative regulatory scheme. As for the feasibility of refunding these overpayments, the Judicial Officer himself has noted that the Order contains a reserve fund to protect handlers against any damages sustained as a result of invalid price orders. In view of the ease with which payments can be made once determined, we remand to the District Court on the issue of damages, with direction to enter judgment for appellant on the amount ascertained after appropriate proceedings.

Remanded.

---

38. Appellant suggests other grounds for reversal, including its assertion that the Order sets up a "trade barrier" in violation of Section 8c(5) (G) of the Act, and that appellant was denied adequate notice of the issues to be explored at the promulgation hearing. Because our decision thus far is sufficient to dispose of this appeal in appellant's favor, we find it unnecessary to reach these additional points.

39. See note 16, *supra*.