BORDEN, INC., Plaintiff-Appellant,

v.

Earl L. BUTZ, Secretary of Agriculture, Defendant-Appellee.

No. 76–1478.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 24, 1976.

Decided Nov. 1, 1976.

Stuart S. Ball, David T. Pritikin, Sidley & Austin, Chicago, Ill., Walter W. Kocher, Columbus, Ohio, for plaintiff-appellant.

Samuel K. Skinner, U. S. Atty., Chicago, Ill., John H. Sandor, Atty., Dept. of Agriculture, Washington, D.C., for defendant-appellee.

Before SPRECHER and BAUER, Circuit Judges, and KUNZIG, Judge.*

SPRECHER, Circuit Judge.

This appeal concerns the validity of certain amendments to milk marketing orders by the Secretary of Agriculture under a provision of the Agricultural Marketing Agreement Act of 1937, 7 U.S.C. § 608c(5)(A).

I

Prior to September 1, 1970, Borden operated a milk processing plant at Rock Island, Illinois, which served the Quad Cities—Dubuque Market Area and which was regulated under the Quad Cities—Dubuque Milk Marketing Order No. 63, 7 C.F.R. Part 1063 (1970). Also prior to September 1, 1970, Borden operated another milk processing plant at Des Moines, Iowa, which was regulated under the Des Moines Milk Marketing Order No. 79, 7 C.F.R. Part 1079 (1970). This second plant served the Des Moines area, but also served the Cedar Rapids—Iowa City area (Order No. 70), the North Central Iowa area (Order No. 78), the Greater Kansas City area (Order No. 64), the Nebraska—Western Iowa area (Order No. 65) and the Quad Cities—Dubuque area (Order No. 63).

The Rock Island plant purchased its principal milk supply from Mississippi Valley Milk Producers Association and the Des Moines plant purchased its principal milk supply from Mid-America Dairymen, Inc.

On September 1, 1970, Borden discontinued bottling operations at the Rock Island plant and its fluid milk accounts in the Quad Cities—Dubuque area were thereafter served from the Borden plant at Des Moines. After September 1, the Des Moines plant's supplies of milk were purchased from Mississippi Valley.

Under the terms of Order Nos. 63 and 79, any particular plant is regulated in the market where it has the greatest distribution of milk. Consequently, upon the closing of the Rock Island plant and the assuming of its business by the Des Moines plant, the Des Moines plant became subject to the Quad Cities—Dubuque Order.

Borden's Des Moines plant was subject to the Quad Cities—Dubuque Order from September 1, 1970 through July 31, 1971, when the Des Moines plant was shut down. During that period the Class I price under the Quad Cities—Dubuque Order was 15 cents per hundredweight lower than the Class I price under the Des Moines Order.

The Quad Cities—Dubuque Order also provided that the price for Class I milk should be reduced

[a]t a plant located outside the marketing area and 70 miles or more, by the shortest hard-surfaced highway distance . . . from the nearer of the City Hall, Rock Island, Ill., or the Post Office, West Liberty, Iowa, by 10 cents and by an additional 1.5 cents for each 10 miles or fraction thereof that such distance exceeds 80 miles.

7 C.F.R. § 1063.52(a)(2) (1970).

Inasmuch as Borden's Des Moines plant was approximately 140 miles from the Quad

---

* Honorable Robert L. Kunzig, Judge, United States Court of Claims, is sitting by designation.

Cities base point, it was entitled to a "location adjustment" of 10 cents per hundredweight plus 1.5 cents per 10 miles for the 60 miles by which 140 exceed 80 miles, or a total location adjustment of 19 cents per hundredweight, which, when added to the 15 cents price differential, resulted in Borden's Des Moines plant paying 34 cents per hundredweight less than other milk handlers located in Des Moines but subject to the Des Moines Order. However, any Des Moines plant which desired to distribute all or the greater of its milk in the Quad Cities—Dubuque area would have had exactly the same advantage in thereby transferring its plant from the operation of the Des Moines Order to the Quad Cities—Dubuque Order.

Borden had no competitive advantage over other handlers subject to the Quad Cities Order, since those handlers also paid 15 cents less than the Des Moines Order price for Class I milk and the 19 cents location adjustment was offset by the transportation costs involved in distributing milk to the Quad Cities—Dubuque area from 140 miles away in Des Moines.

Borden had no competitive advantage in the Des Moines market area since it voluntarily agreed with its producers to pay the same price paid by other Des Moines handlers for milk purchased for resale in the Des Moines area.

Under the milk marketing orders as they then existed, Borden's closing down of the Rock Island plant and supplying its Quad Cities customers from the Des Moines plant was entirely lawful and proper. Borden's mistake apparently was an economic one of deciding to purchase milk from Mississippi Valley Milk Producers Association, an independent dairy cooperative, after the changeover, instead of from Mid-America Dairymen, Inc., another independent dairy cooperative. Mid-America promptly requested the Department of Agriculture to suspend the 19 cents location adjustment.

There followed the issuance of three orders of the Secretary of Agriculture, the validity of which form the basis for this appeal:

1. *October 1, 1970, order.* On September 12, 1970, the Department of Agriculture caused to be published in the Federal Register a notice of proposed suspension of 7 C.F.R. § 1063.52(a)(2) of the Quad Cities—Dubuque Order for the months of September and October 1970. The notice did not provide an opportunity for a hearing, and no hearing was held. Borden submitted its exceptions to the proposed suspension, noting that it would only affect Borden and none of its competitors. On October 1, 1970, the Secretary issued an order suspending 7 C.F.R. § 1063.52(a)(2) for the month of October only. The order is worded in such a manner as to apply only to Borden.

2. *October 29, 1970 order.* On September 30, 1970, notice was issued, and on October 3 it was published, of a hearing to be held on October 8 on five proposed amendments to the Quad Cities—Dubuque, Cedar Rapids—Iowa City and Des Moines marketing orders. An order was issued on October 29, effective November 1, 1970, amending the Quad Cities—Dubuque Order No. 63 by permanently eliminating the 19 cents minus location adjustment applicable to Borden's Des Moines plant and for a six-month period through April 1971, providing for a 15 cent plus location adjustment applicable to plants located within the Des Moines marketing area. The order increased Borden's price for Class I milk by 34 cents per hundredweight by amending 7 C.F.R. § 1063.-52(a)(2), as follows (added language emphasized):

At a plant located outside the marketing area *and outside the Des Moines, Iowa, marketing area* . . . and 70 miles or more, by the shortest hard-surfaced highway distance . . . from the nearer of the City Hall, Rock Island, Ill., or the Post Office, West Liberty, Iowa, subtract 10 cents and subtract an additional 1.5 cents for each 10 miles or fraction thereof that such distance exceeds 80 miles.

The October 29, 1970 order also added a new § 1063.52(a)(3) as follows:

During the period November 1, 1970, through April 1971 at a plant located

within the Des Moines, Iowa, marketing area, add any amount by which the price specified . . . is less than the applicable Class I price at the same location pursuant to . . . [Order No. 79] regulating the handling of milk in the Des Moines, Iowa, marketing area.

The October 29 order did not amend the Cedar Rapids—Iowa City or the Des Moines marketing orders. Although phrased in general terms, the order was worded so as to apply only to Borden.

3. *April 28, 1971 order.* Pursuant to notices published on April 7 and 9, 1971, hearing was held on April 13, resulting in the issuance on April 28, 1971 of an order removing the April 1971 expiration date from § 1063.52(a)(3), so as to retain the plus 15 cents location differential.

On July 31, 1971, Borden closed its Des Moines plant and discontinued operations in the Des Moines area. Thereafter, on October 8, 1971, § 1063.52(a)(2) and (3) were again amended to change the language which had applied solely to Borden.[1]

In accordance with 7 U.S.C. § 608c(15)(A), Borden filed petitions with the Secretary of Agriculture challenging the three orders as "not in accordance with law and praying for a modification thereof." The orders were upheld in an Initial Decision filed by an Administrative Law Judge (ALJ) on March 13, 1974. Borden appealed to the Judicial Officer inasmuch as final administrative authority to decide cases under the Agricultural Marketing Agreement Act of 1937, has been delegated to the Judicial Officer. 37 Fed.Reg. 18475; 38 Fed.Reg. 10795. The Judicial Officer on August 15, 1974, adopted the Initial Decision, added

some conclusions, denied the relief requested by Borden and dismissed the petitions.

In accordance with 7 U.S.C. § 608c(15)(B), Borden sought review in the district court, which on February 11, 1976, entered summary judgment on behalf of the Secretary of Agriculture. Borden has appealed that decision.

II

The Agricultural Marketing Agreement Act of 1937 as amended provides that the Secretary of Agriculture may fix minimum prices for each use classification which all handlers shall pay for milk purchased from producers or associations of producers, but "prices shall be uniform as to all handlers, subject only to adjustments for: (1) volume, market, and production differentials customarily applied by the handlers subject to such order; (2) the grade or quality of the milk purchased; and (3) the locations at which delivery of such milk, or any use classification thereof, is made to such handlers." 7 U.S.C. § 608c(5)(A).

"The statute before us does not contain a mandate phrased in broad and permissive terms." *Zuber v. Allen*, 396 U.S. 168, 183, 90 S.Ct. 314, 323, 24 L.Ed.2d 345 (1969). The Second Circuit has noted in *Fairmont Foods Co. v. Hardin*, 143 U.S.App. D.C. 40, 442 F.2d 762, 766 (1971):

. . . [I]t is important to keep in mind the limited scope of authority that Congress delegated to the Secretary in the field of milk marketing regulations. This is not a case where the power of an agency or officer is bounded only by the broad Congressional mandate that it be exercised in the "public interest." . . . [T]he Secretary was required to operate

---

1. 7 C.F.R. § 1063.52(a)(2) and (3) (Jan. 1, 1972):
 (2) At a plant located outside the marketing area, north of U. S. Highway No. 80, and, except as provided in subparagraph (3) of this paragraph, 70 miles or more, by the shortest hard-surfaced highway distance as determined by the market administrator, from the nearer of the City Hall, Rock Island, Ill., or the Post Office, West Liberty, Iowa, subtract 10 cents and subtract an additional 1.5 cents for each 10 miles or fraction thereof that such distance exceeds 80 miles; and

 (3) At a plant located in that Iowa territory beyond 70 miles from the nearer of the City Hall, Rock Island, Ill., or the Post Office, West Liberty, Iowa, and south of U. S. Highway No. 80, or within the Des Moines, Iowa, marketing area as specified in Part 1079, add any amount by which the price specified in § 1063.50(b) is exceeded by the applicable Class I price at the same location pursuant to Part 1079 regulating the handling of milk in the Des Moines, Iowa, marketing area.

within the narrow confines of powers expressly granted.

The Secretary is authorized to make only certain adjustments and these are to "compensate or reward the producer for providing an economic service of benefit to the handler." *Zuber, supra*, 396 U.S. at 184, 90 S.Ct. at 323. And "the permissible adjustments are limited to compensation for rendering an economic service." *Zuber, supra*, at 188, 90 S.Ct. at 325. *Fairmont, supra*, at 767. "The court must invalidate orders resting on any basis other than such economic reasons,—whether the orders are ascribable to whim, which seems unlikely; or to the response of major farm interests, which may be more likely; or merely bureaucratic error in supposing that the wisdom of experts as to what is needed in the public interest must be given dominance over the constraint of Congress." *Fairmont, supra*, at 766.

7 U.S.C. § 608c(4) requires that the Secretary issue a marketing order based upon the evidence adduced at a hearing, which in turn requires that an order be supported by substantial evidence. *Fairmont, supra*, at 767; *Lewes Dairy, Inc. v. Freeman*, 401 F.2d 308, 317 (3d Cir. 1968), *cert. denied*, 394 U.S. 929, 89 S.Ct. 1187, 22 L.Ed.2d 455 (1969). The evidence in the record here consists of that introduced in two hearings on October 8, 1970 and on April 13, 1971. Borden has challenged the sufficiency of the evidence at every stage of these proceedings (Judicial Officer's Decision and Order, at 63; district court complaint, paras. 35(b), 36(f) and 37(g); Borden Brief on Appeal at 20, 26).

We proceed to examine the economic justifications advanced for the increase of Borden's Class I milk price by 34 cents per hundredweight and the evidence adduced in support of such justifications.

The first economic justification was a "for Borden's own good" finding: "[I]t is not reasonable to expect producers to continue to deliver milk to the Borden, Inc., plant while higher prices are available to them at most other regulated plants in the region, including those located in the Quad Cities—Dubuque marketing area" (October 1, 1970 order). It can be noted at the outset that Des Moines was a "deficit market" and that the only milk supply problem would have been short supply rather than a glutted market or depressed prices.

A vice president of Mid-America Dairymen, Inc., the dairy cooperative which lost the Borden business at Des Moines when the Borden Rock Island plant was shut down, testified that the Des Moines area has historically been a deficit market during the fall and winter months and that the primary purpose of a fixed price "is to bring forth an adequate supply of pure and wholesome milk." Ex. E at 24.

In the thirteen months (ending September 1, 1970) prior to the October 1, 1970 order, approximately 10% of the milk in the Des Moines area was imported from outside that area. Ex. E, attached Ex. 3, at 4. Milk was imported monthly to Des Moines, primarily from the North Central Iowa, and Cedar Rapids—Iowa City marketing areas (Ex. E at 17).

How would the presence of the Borden plant at Des Moines, but regulated under the Quad Cities order, affect the short supply of milk at Des Moines? The only testimony in the record regarding Borden's future supply of milk was that of a Borden witness who said:

> After receiving assurance from Mississippi Valley [dairy cooperative] that it could supply Borden with an adequate supply of milk, Borden decided to move its bottling operation at Rock Island to its Des Moines plant.

Ex. E at 49.

There is no evidence in the record that Borden would suffer in short supply. The only evidence of short supply generally was the testimony of the Mid-America representative:

> [T]here is some doubt as to the availability of a milk supply for a Quad Cities—Dubuque pool plant located in the City of Des Moines if present pricing provisions

of the Quad Cities—Dubuque Order prevail.

Ex. E at 24 (emphasis added).[2]

In the first place this testimony ("some doubt") is purely speculative.[3] In the second place, if it is to be given any weight whatever, being couched in general terms it would not support the Secretary's equally speculative finding ("not reasonable to expect" adequate supply) of a short supply for Borden.

In the Initial Decision of the Administrative Law Judge, adopted by the Judicial Officer, the following appears:

Thus the Assistant Secretary concluded in his suspension and amendment actions that the Order No. 63 Class I price, less the 19 cent location differential, would not attract a sufficient supply of milk to the Des Moines plant of petitioner [Borden]. *The Secretary did not make or have cause to make such a finding for the other plants which compete with petitioner in the lower priced markets.*

Ex. 35 at 67 (emphasis added).

In the third place, the short supply statement is contrary to the obvious economic factors. There could be no general short supply at Des Moines because of Borden's presence inasmuch as Borden's lower buying price would, according to the Secretary, not attract Des Moines producers and thus not divert suppliers away from other milk handlers in Des Moines. Instead, Borden had an assured supply from outside of the Des Moines area, was attracting outside milk into Des Moines and was alleviating the short supply at Des Moines by freeing Mid-America's supply for other Des Moines—located handlers.

Finally, the only non-speculative testimony on the subject of the supply of specific Des Moines handlers came from the manager of the Beatrice Foods Company's Des Moines plant, who testified that "[w]hen our plant was receiving this minus 10 cent location differential [under the Des Moines order] we experienced no problem obtaining an adequate supply of milk," Ex. I at 163, and from the president of Anderson-Erickson Dairy Company who testified:

Q. Do you feel you can get milk delivered to your plant at Des Moines at 10 cents lower than the price . . . currently applicable?

A. I don't believe we would have too much problem.

Q. You believe you would continue to get milk from your present suppliers?

A. I would feel so.

Ex. I at 135.

The Secretary's decision, rendered prior to the October 29, 1970 order, actually belied the finding of inadequate supply in the October 1 order, stating:

There is indication that additional milk supplies are being added to the Des Moines market. The total number of producers increased from 1,137 in August 1969 to 1,381 in August 1970. Total receipts of milk increased from 34.4 million pounds in August 1969 to 41.6 million pounds in August 1970.

. . . . .

Ex. G at 9–10.

The Secretary's three orders effectively shut down Borden's Des Moines plant and ultimately reduced Des Moines' outside supply of milk. We have searched the record in vain to find evidence supporting the first purported economic justification for the three orders—that is, inadequate supply of milk for Borden—and find none.

The second finding intended to justify the October 1 order and presumably also the other two orders provided:

Such price disparity as between a Quad Cities order plant and a Des Moines order plant located in the Des Moines market-

---

**2.** This testimony was given on October 8, 1970. More than six months later the same witness testified again on April 13, 1971, and interestingly enough, he again used the words "some doubt." Ex. I at 86.

**3.** In *Fairmont Foods Co. v. Hardin*, 143 U.S. App.D.C. 40, 442 F.2d 762, 772 (1971), the court said: "We can find no basis for the Secretary's findings beyond mere speculation, and therefore conclude that . . . his ground of decision . . . must fail."

**318**

ing area would disrupt competitive relationships among such handlers distributing milk in that market. Moreover, it would also threaten orderly marketing in several neighboring markets, such as Kansas City, where milk is distributed from the Borden, Inc., plant at Des Moines.

The Secretary then purported to remedy the alleged market disruptions by dealing with the Quad Cities—Dubuque marketing order instead of with the Des Moines order. In a similar situation, the District of Columbia Circuit said:

> Assuming that the Nebraska—Western Iowa Order is a proper vehicle for remedying market disruptions in the Eastern Colorado market, there must be substantial evidence of such disruption in order to justify the imposition of such price differentials for this purpose. Mere speculation is no warrant for deviating from a principle as paramount as that of uniform price structure within a single order, particularly where the Secretary has other techniques available.

*Fairmont, supra,* at 772.

Some preliminary observations are in order before considering the alleged evidentiary basis for the second justification.

 There was nothing unusual or improper about the fact that Borden's Des Moines plant was regulated under the Quad Cities—Dubuque marketing order. The Assistant Marketing Administrator for both the Des Moines and Quad Cities orders testified that "some of these plants do switch from market to market in their regulation." Ex. E at 19. The ALJ's Initial Decision, adopted by the Judicial Officer, found that:

> The volume of milk distributed from the Borden, Inc., plant in the Quad Cities —Dubuque, Des Moines, and Greater Kansas City markets is nearly the same for each market. . . . In this circumstance, with a relatively small change in the sales volume from the plant in the Quad Cities—Dubuque, Des Moines, or Greater Kansas City markets, regulation

of the plant could shift from one to another.

Ex. 35 at 23.

Also, there was nothing unusual or improper in the fact that Borden "agreed with its producers to pay an additional amount of 15 cents per hundredweight on all milk purchased for resale in the Des Moines Market Area." ALJ Initial Decision, adopted by the Judicial Officer, Ex. 35 at 18. The Secretary's brief in this court states (p. 9):

> It must be emphasized that the order prices set under the Act are minimum prices only. Producers need not sell their milk for these minimum prices; they can and do bargain for effective prices which are above order minimums; however, they must be paid at least the minimum prices under the order.

We now consider the evidence, if any, supporting the second economic justification. In regard to raw milk purchased for resale in Des Moines, Borden had already agreed to pay plus 15 cents per hundredweight for such milk so that no economic disruption or advantage could occur. Furthermore, if Borden even theoretically had a competitive advantage and thereby increased its Des Moines sales, the slightest increase in Des Moines sales would have resulted in Borden's selling the plurality of its Class I milk in Des Moines and automatically transferred Borden's plant to regulation under the Des Moines order, thus eliminating the advantage. Nor did Borden enjoy any competitive advantage over other milk handlers in the Quad Cities—Dubuque market inasmuch as they were all subject to the same Quad Cities order with the same location adjustments. However, when the three orders at issue here were promulgated, Borden immediately suffered a 19 cents per hundredweight economic disadvantage. If anything, the orders created, rather than tending to eliminate, disruptive competitive relationships.

Significantly, shortly after Borden shut down its Des Moines plant, the Secretary issued on August 6, 1971, an order decreasing the Des Moines price by five cents and increasing the Quad Cities price by three

cents, thereby reducing the disparity between the two prices from 15 cents to seven cents. 36 Fed.Reg. 14752. This left the two prices seven cents more "disruptive" than under Borden's voluntary 15 cent plus agreement.

In addition to the evidence adduced at the October 8, 1970 and April 13, 1971 hearings, we have examined the ALJ's Initial Decision, the Judicial Officer's "Additional Conclusions" and the Secretary's brief on appeal, as well as the three orders themselves in an attempt to find any basis upon which to support the second purported economic justification. We can find none. In fact, it is somewhat extraordinary that with a record of the volume of that before us the Secretary can point to no supportive evidence other than the expressed desires of Mid-America and several milk handlers competing with Borden that Borden be stripped of the 34 cents minus price difference. The testimony of these witnesses consisted of hortatory, conclusory and speculative opinions and predictions. On the other hand, Borden was precluded from introducing specific evidence of its transportation costs to the Quad Cities in order to justify continuance of the 19 cent minus location adjustment which was being taken from it but from no other handlers. Ex. I at 198–201.

■ We agree with the *Fairmont* court that "[w]hile normally the court defers to administrative expertise, the record is so devoid of support for the Secretary's finding[s] . . . that the finding[s] cannot be allowed to stand," 442 F.2d at 770, particularly in view of the narrow construction of the Agricultural Marketing Agreement

Act of 1937 mandated by *Zuber, supra,* 396 U.S. at 183–85, 90 S.Ct. 314.[4]

We have therefore determined that the three rulings of the Secretary at issue here are not in accordance with law and are invalid inasmuch as they all ultimately rely upon the unsupported findings of the October 1, 1970 order.[5]

### III

It is unnecessary for us to consider the many procedural issues which consumed most of the attention of the Administrative Law Judge, the Judicial Officer and the court below, or to consider Borden's argument that the penalties imposed upon it by the three orders were similar to the subsidies declared illegal by the Supreme Court in *Lehigh Valley Cooperative Farmers, Inc., v. United States,* 370 U.S. 76, 82 S.Ct. 1168, 8 L.Ed.2d 345 (1962), as trade barriers prohibited by 7 U.S.C. § 608c(5)(G).

### IV

■ In regard to remedy, the three orders found invalid here have since been replaced by a new order and Borden has ceased doing business in Des Moines so there is no need for injunctive or declaratory relief. As to damages, Borden is entitled to recover overpayments which it made pursuant to the invalid orders. Inasmuch as the Quad Cities—Dubuque marketing order provides for payment by the market administrator to handlers out of the producer-settlement fund where claims are made pursuant to 7 U.S.C. § 608c(15)(A), 7 C.F.R. § 1063.89(d), we remand to the district court on the issue of damages, with di-

---

4. The case heavily relied on by the Secretary, *Sunny Hill Farms Dairy Co., Inc. v. Hardin,* 446 F.2d 1124 (8th Cir. 1971), did not address the sufficiency of evidence issue of *Fairmont* inasmuch as "Sunny Hill had not challenged the sufficiency of the evidence in support of the Secretary's findings that the differential was necessary to ensure an adequate supply of milk . . . ." *Sunny Hill, supra,* at 1127.

5. The Initial Decision of the Administrative Law Judge, adopted by the Judicial Officer, concluded that another "factor to be considered is the requisite producer approval of

such an order or amendment" in accordance with 7 U.S.C. § 608c(9) and (19). Ex. 35 at 70. In the *Zuber* case the Supreme Court noted that "[i]t is the Secretary, not the farmers, who is responsible for administering the statute and initiating orders." 396 U.S. at 196, 90 S.Ct. at 329. In the context of the present case, although the amending order of October 29, 1970 was approved by two-thirds of the milk producers in the marketing area, such approval does not constitute evidence that the order or any of the three orders was justified.

rection to enter judgment for Borden in the amount ascertained after appropriate proceedings. *Fairmont, supra,* at 773.

The judgment of the district court is reversed and the cause remanded with directions to deny the defendant's motion for summary judgment, to grant the plaintiff's motion for summary judgment and to ascertain plaintiff's damages.

Reversed and remanded.