**FRIENDSHIP DAIRIES, INC., et al., Plaintiffs,**

v.

**Earl BUTZ, Secretary of the Department of Agriculture of the United States, Defendant.**

No. 75 C 1517.

United States District Court, E. D. New York.

May 18, 1977.

Booth, Lipton & Lipton, New York City, for plaintiffs; David C. Toomey, Duane, Morris & Heckscher, Philadelphia, Pa., of counsel.

David G. Trager, U. S. Atty., Eastern District of New York, Brooklyn, N. Y., for defendant; Cyril Hyman, Asst. U. S. Atty., Brooklyn, N. Y., of counsel.

Simpson, Thacher & Bartlett, New York City, for intervenor Pennmarva Dairymen's Cooperative Federation, Inc.; Donald F. Copeland, Speese, Bongiovanni & Copeland, Philadelphia, Pa., of counsel.

## MEMORANDUM AND ORDER

NEAHER, District Judge.

Plaintiffs, nine manufacturers of milk products ("handlers"), brought this action pursuant to § 8c(15)(B) of the Agricultural Marketing Agreements Act ("Act"), 7 U.S.C. § 608c(15)(B), for judicial review of a ruling by the Secretary of Agriculture ("Secretary") which amended a milk marketing order ("Order No. 2"), 7 C.F.R. § 1002, so as to change the formula for calculating minimum milk prices to be paid by handlers to dairy farmers ("producers"). The matter is now before the court on the parties' cross-motions for summary judgment.

### I.

In accordance with the Act, the Secretary has issued 61 orders regulating the marketing and pricing of milk in various regions of the country. Order No. 2, which covers the eastern part of New York and the northern part of New Jersey, divides milk into two categories: milk used in its fluid state is in Class I, while milk used in the manufacture of other dairy products, such as butter and cheese, is in Class II. Prior to the amendment in question, the price for Class II milk (also known as "reserve milk") was the lower of the prices derived from two alternative formulas: (1) the Minnesota-Wisconsin ("M–W") Series, which is an average of the actual prices paid for milk by selected cheese plants in Minnesota and Wisconsin, and (2) the butter-powder ("b-p") formula, which is based on the public prices paid for butter and nonfat dry milk powder. Generally the two formulas produced fairly similar prices.

Beginning in October 1973, however, the b-p price dropped precipitously below the M–W price due to imports of butter and nonfat milk powder. Thus the b-p formula became the determinant of Class II prices. The decline in the price of Class II milk occasioned by this change led producers to request the Secretary to hold hearings concerning the continued efficacy of the b-p formula.

Responding to the producers' request, the Department of Agriculture issued notice on February 12, 1974 to consider proposed amendments to eight orders, including Order No. 2, covering the northeastern part of the country and to consider whether emergency marketing conditions warranted omission of a recommended decision. As published two days later in the Federal Register, the notice contained 17 proposals for changes in the Class II milk pricing provisions.

The day before the hearing began the Department issued four decisions covering 39 midwestern orders ("the 39 order decisions") which eliminated the b-p price from

the pricing formulas of the 15 midwestern orders which had used it and made the M–W price the sole determinant of Class II milk prices in all 39 orders.

The hearing on the northeastern orders was conducted in Washington, D.C. for six days between February 20–28, 1974. The hearing record consists of 1094 pages and 46 exhibits. The parties were given eight days from the conclusion of the hearing to submit briefs. On March 27, 1974 the Assistant Secretary issued a "partial decision" in which he announced an emergency amendment removing the b-p formula as an alternative method of pricing Class II milk from April 2 through July 31, 1974. 39 FR 11567 (Mar. 29, 1974). An order issued two days later confirmed the following temporary pricing scheme: the price of milk utilized in manufacturing products other than butter and nonfat dry milk would be the M–W price, and milk utilized in butter and nonfat dry milk production would be priced below the M–W price by the amount, not to exceed 50 cents, that the b-p price was below the M–W price. 39 FR 11980 (Apr. 2, 1974).

On June 25, 1974 the Associate Administrator issued a recommended decision that the M–W Series be the permanent basis for determining the Class II milk price. 39 FR 23063 (June 26, 1974). Following a period of time for the filing of exceptions, the Assistant Secretary adopted the recommended decision on July 25, 1974. 39 FR 27678 (July 31, 1974). After the requisite two-thirds of the producers approved the decision, an order was issued on August 21, 1974 in conformity with the decision. 39 FR 30925 (August 27, 1974).

Plaintiffs' administrative appeal was denied by an administrative law judge on June 2, 1975 in an initial decision. This was adopted as the final decision by the Judicial Officer, on behalf of the Secretary, on August 26, 1975. Plaintiffs then commenced the instant action to review the final decision.

## II.

■ The Act empowers the court to remand the proceedings to the Secretary if his ruling is "not in accordance with law." 7 U.S.C. § 608c(15)(B). The court's function is limited to "ascertaining whether or not his findings are supported by any substantial ͻvidence and his conclusion authorized by law." *New York State Guernsey Breeders' Co-op. v. Wickard*, 141 F.2d 805, 808 (2 Cir.), *cert. denied*, 323 U.S. 725, 65 S.Ct. 58, 89 L.Ed. 582 (1944).

### A. Standing

Before turning to the merits of plaintiffs' appeal, defendant's challenge to the standing of six of the nine plaintiffs must be considered. As to two of them, Cuba Cheese Co. and Pollis Dairy Products, Inc., defendant contends that Congress conferred standing only on "handlers" and that these two companies are not handlers because they are not subject to regulation under Order No. 2. Although the suppliers of these dairy processors are subject to regulation, defendant likens the two companies to consumers, who were denied standing in *Rasmussen v. Hardin*, 461 F.2d 595 (9 Cir.), *cert. denied*, 409 U.S. 933, 93 S.Ct. 229, 34 L.Ed.2d 188 (1972).

■ In *Harry H. Price & Sons v. Hardin*, 425 F.2d 1137 (5 Cir. 1970), *cert. denied;* 400 U.S. 1009, 91 S.Ct. 568, 27 L.Ed.2d 622 (1971), a similar case involving a handler not directly regulated by the order in question, the Fifth Circuit held that the plaintiff had standing because it was "arguably within the zone of interests [of] the statute" within the rule of *Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). See also *Walter Holm & Co. v. Hardin*, 145 U.S.App.D.C. 347, 449 F.2d 1009 (1971). The Act includes "processors" within the definition of "handlers" without limitation to "regulated processors." 7 U.S.C. § 608c(1). Therefore, the court holds that these two unregulated processors have standing to join in this suit because they are adversely affected by the Secretary's action and they are arguably within the zone of interests of the Act.

512

■ Defendant also seeks the dismissal of Friendship Dairies, Inc., Crowley Food, Inc., Saratoga Dairy, Inc. and Deltown Foods, Inc. because they are not located in this district as required by 7 U.S.C. § 608c(15)(B). This provision, which speaks in terms of jurisdiction, is similar to a venue statute. *Cf.* 1 Collier on Bankruptcy ¶ 2.14 (Section 2a(1) of the Bankruptcy Act, which uses the term "jurisdiction", pertains to venue). Thus, although these four plaintiffs alone would have been required to sue in their home district, the court will allow them to remain in the action since they are directly affected by the amendment to the order and have participated in all previous steps in this litigation.

Plaintiffs have raised three objections to the amendments: (1) the manner in which defendant proceeded in issuing these orders violated due process and statutory provisions; (2) the amendment to the order is not supported by substantial evidence; and (3) local conditions were not reflected in the amendment as required by statute.

B. *Due Process*

Plaintiffs' first argument is directed at the hurried nature of the proceedings. This issue ultimately turns on whether the record supports such emergency measures.

■ Plaintiffs begin by charging that they did not receive "due notice" of the hearing as required by 7 U.S.C. § 608c(3). There is no question that notice was given. Their objection is that the Secretary allowed only six days between the notice of the hearing in the Federal Register and the date the hearing began. The notice, however, was issued eight days before the hearing, and there was evidence that some of the plaintiffs were notified by mail as early as sixteen days before. In any event, three days notice is deemed to be due notice of a hearing on an amendment. 7 U.S.C. § 608c(17); 7 CFR § 900.4(a).

■ While plaintiffs contend that they should have been afforded more time to prepare their opposition to the important amendments proposed in this case, the need

for expediting the proceedings was reasonably apparent, as will be shown below. Therefore, due process was not violated by the timing of the notice. See *Ideal Farms, Inc. v. Benson*, 181 F.Supp. 62 (D.N.J.1960), aff'd, 288 F.2d 608 (3 Cir. 1961), cert. denied, 372 U.S. 965, 83 S.Ct. 1087, 10 L.Ed.2d 128 (1963); *Carnation Co. v. Butz*, 372 F.Supp. 883, 889 (D.D.C.1974). Apposite here is the more recent comment in *Condor Operating Co. v. Sawhill*, 514 F.2d 351 (Em.App.1975), cert. denied, 421 U.S. 976, 95 S.Ct. 1975, 44 L.Ed.2d 467 where the need for a "freeze" in respect of crude oil transactions was challenged. In reversing the district court's injunction against enforcement, the court observed:

"Where the obvious intent of Congress is to give the President and his delegates broad power to do what reasonably is necessary to accomplish legitimate purposes rendered necessary by a recognized emergency, and regulations are fashioned to implement the Congressional mandate, the court should not interfere with the prerogative of the agency to select the remedy which for rational reasons is deemed most appropriate." *Id.* at 359.

Here, Congress itself provided for the shortened hearing notice adopted by the Secretary.

The remainder of plaintiffs' procedural argument challenges the legality of the post-hearing procedures. These objections are directed at the issuance of the temporary amendment in the partial decision of March 27, 1974. Plaintiffs contend that they were improperly deprived of a recommended decision and an opportunity to file exceptions thereto. The Administrative Procedure Act requires a recommended decision unless "the agency finds on the record that due and timely execution of its functions imperatively and unavoidably so requires." 5 U.S.C. § 557(b)(2). Plaintiffs also object to the Department's failure to publish its partial decision 30 days before its effective date. Such a failure can only be excused by "good cause found and published with the rule." 5 U.S.C. § 553(d)(3).

In the partial decision on March 27, 1974 the Assistant Secretary offered the following summary of his reasons for finding that this case fell within the exceptions to the procedural requirements noted above:

"The due and timely execution of the function of the Secretary under the Act imperatively and unavoidably requires the omission of a recommended decision and opportunity for exceptions thereto on Issue No. 1 [the immediate need for abolishing the b-p formula]. The current marketing conditions in the aforesaid marketing areas are such that it is urgent that remedial action be taken as soon as possible. It is necessary to correct at the earliest opportunity the alignment of reserve milk prices in the midwest as well as the prices being paid for manufacturing grade milk."

In the order instituting the amendment on March 29, 1977, the Assistant Secretary made the following additional finding:

"It is necessary in the public interest to make this order amending the order effective April 3, 1974. Any delay beyond that date would tend to disrupt the orderly marketing of milk in the marketing area.

"The provisions of this order are known to handlers. . . . The changes effected by this order will not require extensive preparation or substantial alteration in method of operation for handlers. In view of the foregoing, it is hereby found and determined that good cause exists for making this order amending the order effective April 3, 1974, and that it would be contrary to the public interest to delay the effective date of this amendment for 30 days after its publication in the Federal Register."

▮ Although these explanations may in part paraphrase the statutory language, this is not improper if there is "firm basis in the record" for the findings. *United States v. Mills*, 315 F.2d 828, 833 (4 Cir.), *cert. denied*, 375 U.S. 819, 84 S.Ct. 57, 11 L.Ed.2d 54 (1963).

After a thorough examination of the record, the court finds that there is "firm basis" to support the conduct of proceedings on an emergency basis. The record contains substantial evidence of the serious problems confronting producers in the Order No. 2 area and of the potential for disruption of normal marketing channels as a result of the 39 order decisions covering most of the remaining marketing areas of the country.

The first factor supporting expedited procedures was the deteriorating state of marketing conditions then present in the Order No. 2 region. In the year prior to October 1973, costs to the dairy farmers had increased 20% while prices were going up only 10%. A comparison of October 1973 with the previous October showed a decline of 1,483 producers and 39,248,897 pounds of production. If the trend were allowed to continue, shortages of milk would have been the likely result.

Actions by the federal government added to the difficulties faced by the dairy farmers. Huge shipments of butter and nonfat dry milk powder were allowed to be imported into the country. As a result, the butter-powder price dropped uncharacteristically far below the M–W price. At the time of the hearing there was no indication of a change in the governmental policy favoring imports.

In essence, this meant that dairy farmers were facing hard times and needed some means of overcoming the resulting problems. When the M–W price rose dramatically at the end of 1973 they realized that they could overtake rising costs by using that price alone. From October 1973 to January 1974 dairy farmers regulated by Order No. 2 received $10,700,000 less under the b-p price than they would have obtained if the M–W price had been in effect. If price relief were not given immediately, more producers would drop out of the picture.

Further insight into the problem can be gained from the following statement by the Assistant Secretary in his partial decision:

"It is quite evident that current reserve milk prices in the eight markets herein

considered are not providing producers a return for that portion of their milk utilized in manufactured dairy products reflecting its full use value. Producers should not be expected to continue to accept less for their milk not needed for Class I uses than its full use value." 39 FR 11568.

The second factor in favor of the expedited procedures was the disparity in prices paid for reserve milk in the northeast as opposed to the prices in the majority of the orders throughout the rest of the country. The 39 order decisions had recently added 15 orders to the 27 which already used the M–W price as their sole pricing mechanism. Maintaining the b-p price in the northeast would have disrupted marketing channels and led to dislocation of production facilities, for the competition in reserve milk was nationwide. Eliminating the b-p price in the northeast, on the other hand, would immediately provide a strong foundation for orderly marketing, for then over 85% of the nation's butter, cheese and nonfat dry milk powder would be priced uniformly.

Plaintiffs object to the Department's basing its decision in part on the 39 order decisions. The decisions were issued only the day before the hearing began in this case. Copies of the decisions were not available during the hearing. All that was known was that the b-p price had been dropped. That information, however, was entirely sufficient. The text of the decisions would not have aided plaintiffs, for the result alone caused the problems of price competition with the northeast orders.

These factors taken together present sufficient reason for the expedited action by the Secretary. That the order under consideration had only a temporary effect is an important consideration. The final decision with respect to long-term pricing followed the normal, more deliberate procedures required by the Administrative Procedure Act.

C. *Substantiality of the Evidence*

■ The finding of substantial evidence in support of the procedural aspects of this case goes far toward establishing that there was substantial evidence in support of the Secretary's substantive decision. Since the "emergency" centered around the continued use of the b-p price in the northeast orders, it was reasonable to resolve the emergency by eliminating that price from the pricing formula.

Plaintiffs nevertheless argue that the amendment was not supported by substantial evidence because there is doubt about the validity of the M–W Series. In particular they point to the Secretary's admission that there is no regular effort to verify the prices which comprise the Series. They also contest the Secretary's refusal to produce evidence of its validity.

The flaw in this argument is that the hearing did not concern the question of dropping the M–W Series. All of the 17 proposals examined at the hearing retained the M–W Series in the pricing formula. In fact, the handlers supported the M–W Series, as long as the b-p snubber was also maintained. The M–W Series, in effect, was a "given" of the hearing. A challenge to its validity was beyond the scope of the hearing.

The b-p price was introduced in Order No. 2 in 1968 as an alternative to the M–W price. It was designed to clear burdensome supplies of reserve milk from the market by assuring that the price level for reserve milk would not rise above a fixed margin under the market value of butter and nonfat dry milk powder. Due to a substantial decline in milk supplies since mid-1972, the problem of reserve milk was no longer a serious problem at the time of the hearing. Thus the b-p price had outlived its usefulness and had even turned into a distinct liability as a result of the large gap which had developed between it and the M–W price.

■ The 39 order decisions added to the adverse impact of the b-p price, for the sharp price disparity between the northeast and midwest would have further disrupted marketing conditions. Price alignment is a legitimate concern of the Secretary, and in

this case he properly decided that such alignment was necessary. See *Sunny Hill Farms Dairy Co. v. Hardin*, 446 F.2d 1124 (8 Cir. 1971).

The dairy farmers wanted higher prices and the handlers wanted to keep the status quo. The evidence at the hearing revealed the need for higher prices to ease the price-cost squeeze experienced by the dairy farmers and to avoid the unsettling competition with the midwest. Therefore, the b-p price was dropped.

This decision is in keeping with the principles set forth in a major study undertaken in 1968 by the University of Wisconsin and the University of Minnesota. The study, introduced as an exhibit at the hearing, gave the following explanation of the importance and function of reserve milk pricing:

> "Some reserve supply is necessary and desirable to insure an adequate supply of milk.
>
> \*    \*    \*    \*    \*    \*
>
> "A major objective of surplus pricing is to assure the orderly marketing of the reserves associated with an adequate supply. An equally important objective of surplus pricing is to promote the utilization of available supplies of milk in those uses which will provide the highest possible return to producers, consistent with cost-price relationships for manufactured products." Exh. 40 at 9–10.

The study also warned: "Care should be taken to see that the snubber formula [*i. e.*, the b-p price] is realistic and up-to-date in terms of processing cost allowances." *Id.* at 6.

The voluminous administrative record attests to the substantiality of the evidence supporting the amendment dropping the b-p price. Despite the expedited nature of the proceedings, it is apparent that the opposing viewpoints of the handlers were sufficiently presented. The court may not reweigh the evidence or substitute its own views as to the advisability of the amendment. That function belongs to the Secretary.

### D. Regional Differences

Finally, plaintiffs argue that the Secretary violated the Act's requirement that orders be adjusted area-by-area to take into account differences in marketing, costs and other economic factors. 7 U.S.C. § 608c(5)(A), 608c(11). The Secretary, however, clearly considered local conditions in Order No. 2. Based on the evidence he concluded that the problems facing producers in Order No. 2 at the time of the hearing called for the elimination of the b-p price. That handlers in Order No. 2 have higher costs than those in Minnesota and Wisconsin did not override the need to align Order No. 2 prices with those in the other major orders throughout the country. The Secretary's action does not violate the requirement that differences among the orders be taken into account "so far as practicable." 7 U.S.C. § 608c(11)(C).

In conclusion, it is important to recall that the Act is designed to improve marketing conditions for the benefit of producers. *Waddington Milk Co. v. Wickard*, 140 F.2d 97, 101 (2 Cir. 1944); *Lewes Dairy, Inc. v. Freeman*, 401 F.2d 308, 311 (3 Cir. 1968). The Act empowers the Secretary to make adjustments to milk prices "after due notice and opportunity for hearing" when he finds such action "necessary on account of changed circumstances." 7 U.S.C. § 608c(18). The Secretary properly exercised his authority in this case, for there is substantial evidence in the record and his actions were in accordance with law.

Accordingly, plaintiffs' motion for summary judgment is denied and defendant's motion for summary judgment dismissing the complaint on the merits is granted.

SO ORDERED.