**SCHEPPS DAIRY, INC., a corporation, Appellant,**

v.

**Bob BERGLAND, Secretary, Department of Agriculture.**

No. 77–1881.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 3, 1978.

Decided Nov. 19, 1979.

As amended an Denied of Rehearing Feb. 25, 1980.

Carlyle C. Ring, Jr., Washington, D. C., with whom Lawrence D. Hollman, Washington, D. C., was on the brief, for appellant.

John H. Vetne, Washington, D. C., a member of the bar of the Supreme Court of Michigan, pro hac vice, by special leave of

court, with whom Earl J. Silbert, U. S. Atty., Washington, D. C., at the time the brief was filed, William Kanter, Atty., Dept. of Justice, James Michael Kelly and Raymond W. Fullerton, Asst. Gen. Counsel, U. S. Dept. of Agriculture, Washington, D. C., were on the brief, for appellees. Barbara Allen Babcock, Asst. Atty. Gen., U. S. Dept. of Justice, Washington, D. C., also entered an appearance for appellee.

Before ROBINSON and WILKEY, Circuit Judges, and HAROLD H. GREENE,* United States District Judge for the District of Columbia.

Opinion for the Court filed by Circuit Judge SPOTTSWOOD W. ROBINSON, III.

Dissenting Opinion filed by Circuit Judge WILKEY.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

Schepps Dairy, Inc. (Schepps), a regulated "handler"[1] of milk with a processing plant in Dallas, Texas, brought suit in the District Court challenging certain features of the Secretary of Agriculture's 1975 decision promulgating a pricing order for the Texas milk-marketing area.[2] The District Court sustained the Secretary's motion for summary judgment,[3] and Schepps tenders three issues for our review.

First, and of foremost importance to the administration of federal milk-pricing orders, is whether Section 8c(5)(A) of the Agricultural Marketing Agreement Act of 1937[4] requires the Secretary to modify uniform minimum prices—payable to milk producers by regulated handlers—through "location adjustments" that are precisely reflective of differences in the costs of transporting milk from producing areas to the respective processing plants of the various handlers. Second is the related question whether location adjustments taking into account less than the full transportation cost differentials create trade barriers prohibited by Section 8c(5)(G).[5] Third is a challenge to the Secretary's designation in the Texas order of a one-month "current marketing period" for purposes of terminating regulation pursuant to Section 8c(16)(B).[6] We affirm.

## I. HISTORICAL AND ADMINISTRATIVE BACKGROUND

### A. *Federal Milk-Marketing Orders*

For nearly a half-century, the Secretary of Agriculture has pursued a broad and vital role in the establishment of the prices that many handlers pay many producers of milk. The methodology of federal milk price-fixing has roots extending even deeper in our national economic history. As may readily be expected, a brief sketch of the genesis and evolution of federal milk-marketing orders will serve this appeal by

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a) (1976).

1. See 7 U.S.C. § 608c(1) (1976); 7 C.F.R. § 1126.9 (1979); *Dairymen's League Coop. Ass'n v. Brannan*, 173 F.2d 57, 63–65 (2d Cir.), *cert. denied*, 338 U.S. 825, 70 S.Ct. 73, 94 L.Ed. 501 (1949); *United States v. Adler's Creamery, Inc.*, 107 F.2d 987, 989 (2d Cir. 1939), *cert. denied*, 311 U.S. 657, 61 S.Ct. 12, 85 L.Ed. 421 (1940); *Panno v. United States*, 203 F.2d 504, 509 (9th Cir. 1953).

2. 40 Fed.Reg. 23438 (1975); 7 C.F.R. pt. 1126 (1979). Schepps sought administrative review of the Secretary's order pursuant to 7 U.S.C. § 608c(15)(A) (1976). An administrative law judge rejected Schepps' arguments, and the judicial officer to whom final administrative deci-

sional authority had been delegated, see 37 Fed.Reg. 28475 (1972); 38 Fed.Reg. 10795 (1973), adopted the judge's decision. *Schepps Dairy, Inc.*, AMA No. M126–3 (Oct. 19, 1976), Joint Appendix (J. App.) 496. Schepps then sought review in the District Court, as provided for in 7 U.S.C. § 608c(15)(B) (1976).

3. *Schepps Dairy, Inc. v. Bergland*, C.A. No. 76–1984 (D.D.C. Aug. 15, 1977) (memorandum), J. App. 30.

4. 7 U.S.C. § 608c(5)(A) (1976).

5. 7 U.S.C. § 608c(5)(G) (1976).

6. 7 U.S.C. § 608c(16)(B) (1976).

placing the legal issues in proper social as well as regulatory perspective.[7]

As everybody knows, raw milk is a highly perishable commodity. Without refrigeration, it is storable for only very brief periods and transportable for only very short distances. In the early 1900's, dairy farmers—"producers"[8]—usually were thus compelled to deal with the one or the very few local milk processors available, who accordingly exercised some degree of monopsony power.[9] Moreover, the milk industry was characterized by seasonal overproduction; as the Supreme Court has explained,

> [i]n order to meet fluid demand which is relatively constant, sufficiently large herds must be maintained to supply winter needs. The result is oversupply in the more fruitful months. The historical tendency prior to regulation was for milk distributors, 'handlers,' to take advantage of this surplus to obtain bargains during glut periods.[10]

To correct this discrepancy in bargaining power, Congress enacted legislation enabling dairy farmers to form cooperatives to pool their milk and eliminate overproduction.[11] These cooperatives established classified pricing schemes based on the use to be made of the milk. They priced milk destined for fluid consumption—class I milk—higher than milk slated for manufacture into dairy products such as cheese—class II milk. Though a small part of the price differential might represent cost differences, the bulk was attributable simply to a desire to exploit the relatively inelastic demand for fluid milk without unduly inhibiting the demand for manufactured milk products.[12] To spread the benefits of this pricing strategy among their members, cooperatives would multiply class I prices by the amount of fluid milk sold, and class II prices by the amount of manufactured milk sold, and divide the sum of these products by the total quantity of milk sold to arrive at the "blend price" its members would receive for delivered milk.[13]

The profitability of this system encouraged dairy farmers to increase their output. It also invited farmers selling a higher percentage of their milk for fluid purposes than the cooperative generally to abandon the pooling arrangement and deal individually, and in this manner to realize more than the blend price. This in turn germinated disputes among cooperatives and handlers who dealt with free-lance farmers, and as a consequence, milk markets became highly unstable during the late 1920's.[14] During the Great Depression, demand for fluid milk fell, prices declined drastically and the entire cooperative system collapsed, to the farmers' severe detriment.[15]

Congress reacted by passing the Agricultural Adjustment Act of 1933, which established a licensing system designed to "reestablish prices to farmers at a level that will give agricultural commodities a purchasing

7. See generally, *Leo Sheep Co. v. United States*, 440 U.S. 668, 669–677, 99 S.Ct. 1403, 1405–1409, 59 L.Ed.2d 677, 680–685 (1979).

8. See 7 C.F.R. § 1126.12 (1979); *H. P. Hood & Sons, Inc. v. United States*, 307 U.S. 588, 597–598, 59 S.Ct. 1019, 1024–1025, 83 L.Ed. 1478, 1485–1486 (1939); *United States v. Mills*, 315 F.2d 828, 834 (4th Cir.), *cert. denied*, 374 U.S. 832, 83 S.Ct. 1874, 10 L.Ed.2d 1054 (1963).

9. See Ippolito & Masson, *The Social Cost of Government Regulation of Milk*, 21 J. Law & Econ. 33, 34 (1978).

10. *Zuber v. Allen*, 396 U.S. 168, 173, 90 S.Ct. 314, 317, 24 L.Ed.2d 345, 349 (1969).

11. Clayton Act, ch. 323, 38 Stat. 730 (1914); Capper-Volstead Act, ch. 57, 42 Stat. 388 (1922).

12. *Zuber v. Allen, supra* note 10, 396 U.S. at 172, 90 S.Ct. at 317, 24 L.Ed.2d at 348–349; Ippolito & Masson, *supra* note 9, at 34–35.

13. See, *e. g., United States v. Rock Royal Coop., Inc.*, 307 U.S. 533, 554–555, 59 S.Ct. 993, 1004, 83 L.Ed. 1446, 1460 (1939); *Fairmont Foods Co. v. Hardin*, 143 U.S.App.D.C. 40, 42, 442 F.2d 762, 764 (1971).

14. *Zuber v. Allen, supra* note 10, 396 U.S. at 174, 90 S.Ct. at 318, 24 L.Ed.2d at 349–350; Ippolito & Masson, *supra* note 9, at 35–36.

15. *Zuber v. Allen, supra* note 10, 396 U.S. at 174, 90 S.Ct. at 318, 24 L.Ed.2d at 349–350.

power . . . equivalent to the purchasing power of agricultural commodities in the base period," which extended from August, 1909, to July, 1914.[16] To supplement the provisions of that legislation, and to confine the Secretary of Agriculture's authority within the constitutional limits that very recently had been driven home by the Supreme Court,[17] Congress amended the Agricultural Adjustment Act in 1935.[18] The 1935 amendments to Section 8(3) of the 1933 Act were basically carried over into Section 8c of the new Agricultural Marketing Agreement Act of 1937,[19] which largely controls the instant dispute.

The present statutory provisions can be seen as a shoring, with the power of the Federal Government, of the classified pricing scheme initiated by the cooperatives. Not all of the milk industry is federally regulated, however.[20] Only if producers and handlers so agree, or if two-thirds of the producers or the producers of two-thirds of the output in the area wish, are federal price controls imposed.[21] In each regulated milk-marketing area, class I and II minimum prices are established. No maximum prices are set; producers are free to bargain with handlers for better deals.[22]

Producers are largely indifferent to whether their milk is used for class I or II purposes, for they receive a blend price.

On the other hand, processors must pay at least the minimum class I and II prices. The variance among handlers in the percentages of milk assigned to fluid and manufacturing purposes means that a handler may pay more or less than the producer from whom he is purchasing receives. Any handler who uses more than the average percentage of class I milk must pay the difference over the blend price into a "producers-settlement fund," from which a handler who uses less than the average percentage of class I milk is compensated.[23]

Minimum class I prices, however, are not necessarily uniform across the entire area covered by a milk-marketing order. The requirement of uniform prices is statutorily subject to adjustments "which compensate or reward the producer for providing an economic service or benefit to the handler." [24] Milk-producing regions covered by an order are often distant from consuming centers, and chief among the adjustments enumerated in the Act is one for "the locations at which delivery of . . . milk . . . is made to . . . handlers." [25] The location adjustment honors the fact that a handler who receives milk near consuming centers has a more valuable commodity than a handler who takes in milk in an area further out where it is produced cheaply, but who must undertake the burden of transporting the processed product

**16.** 48 Stat. 31, 32 (1933).

**17.** *A. L. A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935); *Panama Ref. Co. v. Ryan*, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935). See generally, *Brannan v. Stark*, 342 U.S. 451, 72 S.Ct. 433, 96 L.Ed. 497 (1952).

**18.** 49 Stat. 753 (1935).

**19.** 50 Stat. 246 (1937), as amended, 7 U.S.C. § 608c (1976).

**20.** See note 30 *infra* and accompanying text. See also *Dairylea Coop., Inc. v. Butz*, 504 F.2d 80, 87 (2d Cir. 1974) ("the Act does not reach the retail sale of milk").

**21.** 7 U.S.C. §§ 608c(8)–608c(9) (1976); see Kessel, *Economic Effects of Federal Regulation of Milk Markets*, 10 J. Law & Econ. 51 (1967) ("[i]n effect, milk producers can impose control over the handlers").

**22.** *Stark v. Wickard*, 321 U.S. 288, 291, 64 S.Ct. 559, 562, 88 L.Ed. 733, 738–740 (1944). The Secretary does, however, scrutinize above-order prices to assure that they are not the product of monopolistic practices of cooperatives. See 7 U.S.C. § 292 (1976).

**23.** See, *e. g., United States v. Rock Royal Coop., Inc., supra* note 13, 307 U.S. at 555, 59 S.Ct. at 1004, 83 L.Ed. at 1460; *Grandview Dairy, Inc. v. Jones*, 157 F.2d 5, 7 (2d Cir.), cert. denied, 329 U.S. 787, 67 S.Ct. 355, 91 L.Ed. 675 (1946).

**24.** *Fairmont Foods Co. v. Hardin, supra* note 13, 143 U.S.App.D.C. at 45, 442 F.2d at 767, quoting *Zuber v. Allen, supra* note 10, 396 U.S. at 184, 90 S.Ct. at 323, 24 L.Ed.2d at 355.

**25.** 7 U.S.C. § 608c(5)(A) (1976); see 7 U.S.C. § 608c(5)(B) (1976).

to consumer markets.[26] It is the nature of the location adjustment that is the focus of this case.

### B. *The Texas Marketing Order*

In 1973, an association of milk producers proposed that the six then-existing Texas orders be merged. The Secretary solicited comments and additional recommendations from interested parties. Schepps, a handler with a processing plant in Dallas, advocated that the intra-market location adjustment be increased from 1.5 cents per hundredweight (cwt.) of milk per ten miles of transportation to 2.2 cents per cwt. for every ten miles thereof.

In 1975, the Secretary determined that the separate Texas orders should indeed be consolidated.[27] He also decided that the base class I minimum price for the Texas area should continue to be set by the same methodology utilized before.[28] The base Texas class I price, like base class I prices throughout the Nation, is a function of the current price of manufacturing milk in Minnesota and Wisconsin,[29] the most fertile and efficient milk-producing region in the United States. Producers in the northern parts of those states find it profitable to remain unregulated, and the price their manufacturing milk commands is known as the "M–W price."[30] To insure that class I prices are aligned across the country, class I prices in a particular order approximate the sum of the M–W price and the transportation costs from Minnesota–Wisconsin to the area covered by the order.[31]

In the area to which the Texas order pertains, milk production is most efficient around Dallas. In 1975, the Secretary set the class I price in Dallas at the M–W price plus $2.32 per cwt., the preexisting estimate of transportation costs from Minnesota and Wisconsin.[32] This figure was designed to "result in returns to producers sufficient to insure an adequate, but not excessive, supply of pure and wholesome milk for the market."[33]

Within the Texas market, location adjustments were based on similar principles. The Secretary adopted a zone system under which the minimum price paid by a handler increases proportionately to the handler's distance from the Dallas producing area. Under the present order, handlers located in the Houston zone must pay 36 cents over the Dallas minimum price.[34] Under Schepps' plan, Houston handlers would face minimum prices 53 cents over the Dallas class I minimum price.[35] Schepps markets over half of its milk in Houston, so its proposal had the single object of raising its competitors' costs.[36]

The Secretary adhered to a transportation rate of 1.5 cents per cwt. per ten miles in establishing the zone rates, over Schepps' objections that transportation costs are 2.2 cents per cwt. per ten miles. The Secretary, acknowledging that the adjustment may not fully compensate for rising trans-

**26.** See generally, H.R.Rep.No.1241, 74th Cong., 1st Sess. 9–10; *Blair v. Freeman*, 125 U.S.App. D.C. 207, 212–214, 370 F.2d 229, 234–236 (1966). See also Kessel, *supra* note 21, at 65–66.

**27.** 40 Fed.Reg. 20023 (1975) (proposed order); 40 Fed.Reg. 23438 (1975) (final order).

**28.** 40 Fed.Reg. 20023–20025 (1975).

**29.** See generally, Ippolito & Masson, *supra* note 9, at 41–44; Babb, Banker & Nelson, *Price Relations Among Federal Milk Orders*, J. App. 595; Report to the Secretary of Agriculture by the Federal Milk Order Study Committee 23–24 (1962), J. App. 598–599.

**30.** See, *e. g., Friendship Dairies, Inc. v. Butz*, 432 F.Supp. 508, 510 (E.D.N.Y.), aff'd, 573 F.2d

1290 (2d Cir. 1977); Ippolito & Masson, *supra* note 9, at 41.

**31.** See 40 Fed.Reg. 20024 (1975); authorities cited *supra* note 29.

**32.** 40 Fed.Reg. 20024 (1975).

**33.** *Id.*

**34.** 40 Fed.Reg. 20023 (1975) (proposed order); 7 C.F.R. § 1126.52(a)(1) (1979).

**35.** *Schepps Dairy, Inc., supra* note 2, at 10, J. App. 506.

**36.** *Id.* at 5, J. App. 501.

portation costs,[37] explained his refusal to adopt Schepps' figure:

> The Class I price structure under the Texas order is not intended to assure each handler in the market that he will have cost compatibility at any location at which he may choose to distribute milk. Its purpose is to assure handlers, and ultimately consumers, of an adequate milk supply. There has been a reasonable demonstration that the present pattern of milk prices throughout the Texas area has attracted sufficient, but not excessive, raw milk supplies to handlers operating in the various parts of the State. Local considerations do suggest certain price changes at specific locations, and these have been dealt with in this decision. Nevertheless, the supply-demand balance in the market does not warrant a major restructuring of prices that necessarily would result if prices were to reflect a higher transportation rate.[38]

Schepps' second proposition received equally unfavorable treatment. On the vote of a majority of milk producers, Section 8c(16)(B) of the Act requires the Secretary to terminate a milk order "at the end of the then current marketing period for [the] commodity."[39] Previous milk-marketing orders had not defined the term "current marketing period,"[40] and Schepps, concerned over the consequences of possible sudden deregulation, asked that the term be set at one year.[41] The Secretary, however, resolved that the current marketing period should be the first month after announcement of any deregulation vote.[42] Noting that milk is produced on a continuous daily basis and hence lacks a seasonal marketing period, the Secretary considered the one-month period appropriate because "milk has been accounted and paid for under the regulatory program on a monthly basis."[43]

## II. LOCATION ADJUSTMENTS

With the multifaceted regulatory process as the backdrop, we turn to an assessment of Schepps' challenges to the Secretary's order. Section 8c(5)(A) of the Act provides that milk-marketing orders shall

> contain one or more of the following terms and conditions, and . . . no others:
>
> (A) Classifying milk in accordance with the form in which or the purpose for which it is used, and fixing, or providing a method for fixing, minimum prices for each such use classification which all handlers shall pay, and the time when payments shall be made, for milk purchased from producers or associations of producers. Such prices shall be uniform as to all handlers, subject only to adjustments for (1) volume, market, and production differentials customarily applied by the handlers subject to such order, (2) the grade or quality of the milk purchased, and (3) the locations at which delivery of such milk, or any use classification thereof, is made to such handlers.[44]

Analogously, Section 8c(5)(B) of the Act mandates price uniformity among producers, subject again to specified adjustments.[45]

Decisions of the Supreme Court,[46] and of this court[47] as well, have established

37. 40 Fed.Reg. 20024–20025 (1975).

38. *Id.* at 20024.

39. 7 U.S.C. § 608c(16)(B) (1976).

40. See 40 Fed.Reg. 20036 (1975); *Marketing Assistance Program, Inc. v. Butz,* C.A. No. 76–419 (D.D.C. June 29, 1976) (memorandum), aff'd sub nom. *Marketing Assistance Program, Inc. v. Bergland,* 183 U.S.App.D.C. 357, 562 F.2d 1305 (1977).

41. 40 Fed.Reg. 20036 (1975).

42. *Id.*

43. *Id.* See note 85 *infra.*

44. 7 U.S.C. § 608c(5)(A) (1976).

45. 7 U.S.C. § 608c(5)(B) (1976).

46. *E. g., Zuber v. Allen, supra* note 10; *Brannan v. Stark, supra* note 17.

47. *E. g., Fairmont Foods Co. v. Hardin, supra* note 24; *Blair v. Freeman, supra* note 26. See also *Borden, Inc. v. Butz,* 544 F.2d 312 (7th Cir. 1976).

beyond peradventure that the Secretary does not have broad authority to set milk prices at levels derived merely from his assessment of the public interest. On the contrary, the statutory listings of permissible adjustments to price uniformity among producers and handlers, respectively, are exhaustive, and the deviations authorized are solely "for the purpose of reflecting an economic service of benefit to the handler." [48] Schepps infers from these principles that when an economic boon of a kind recognized in one of the Act's enumerated adjustments is conferred upon handlers, it must be totally represented in the form of a higher minimum price. More particularly, as we have explained, Schepps urges that the transportation differential for handlers with plants in Houston must be increased to incorporate all of the actual cost of transporting milk from Dallas. [49]

■ Adoption of Schepps reading of Section 8c(5)(A) would have extremely far-reaching consequences. It would require constant monitoring and modification of all inter-market and intra-market class I minimum prices in order to keep abreast of current transportation costs. For instance, the base class I price in Dallas, which is the sum of the M–W price and a transportation factor calculated at 1.5 cents per cwt. per ten miles, would have had to be increased immediately to account for then-present transportation costs—if Schepps' estimate was accurate—of 2.2 cents per cwt. per ten miles. [50] Indeed, the Secretary's carefully crafted zone system, under which handlers' plants within the same general area are treated identically for purposes of administering the location adjustment, would have to be scrapped in favor of a rate scale attuned more finely to the location of each individual plant, a system the infeasibility of which is hardly open to serious question. [51]

The language of Section 8c(5)(A) itself runs somewhat counter to Schepps' contentions. It is that uniform minimum prices are *"subject . . . to"* certain adjustments, [52] and that connotes a permissive, not a mandatory, qualification. [53] The text of the congressional committee reports is of the same tenor. [54] More importantly, Section 8c(4) authorizes the Secretary to promulgate a marketing order only "if he finds . . . that the issuance of such order and all of the terms and conditions thereof will tend to effectuate the declared policy of [the Act] with respect to [the]

**48.** *Fairmont Foods Co. v. Hardin, supra* note 24, 143 U.S.App.D.C. at 45, 442 F.2d at 767.

**49.** See text *supra* at note 35.

**50.** See 40 Fed.Reg. 20029 (1975).

**51.** This the Secretary took pains to explain:
  Contrary to the exceptor's contentions, price uniformity for all handlers in a market does not contemplate a "precise" alignment of prices (or, in effect, raw milk costs) at different locations based on actual hauling costs. In fact, this is something that simply cannot be achieved. The cost of transporting milk differs from hauler to hauler (as well as between bulk milk and packaged milk if recognition were to be given, as desired by the exceptor, to packaged milk movements). Any reflection of hauling rates in an order could be no more than a reflection of the average hauling rate being experienced by all handlers in the market. This in itself precludes any precise price alignment for individual handlers. Also, it is not possible to establish a price structure under which each plant's Class I price is lower, and at the same transportation rate, than the price at every other plant in the market. Such an arrangement is administratively unworkable in that it would require multiple Class I prices at each plant location.
  A handler may distribute milk in any area he chooses. Should he decide to sell milk in an area where handlers have a lower cost, he must assume any competitive risks involved. It would be uneconomic to have the order provide a handler with cost comparability at any location at which he may choose to distribute milk.
  *Id.* at 20025.

**52.** See text *supra* at note 44.

**53.** *Cf. Burgess Constr. Co. v. M. Morrin & Son Co.*, 526 F.2d 108, 113 (10th Cir. 1975), *cert. denied*, 429 U.S. 866, 97 S.Ct. 176, 50 L.Ed.2d 146 (1976).

**54.** S.Rep.No.1011, 74th Cong., 1st Sess. 10 (1935); H.R.Rep.No.1241, 74th Cong., 1st Sess. 9–10 (1935).

commodity." [55] The principal statutory policies with respect to milk are to guarantee producers parity prices,[56] to protect the health and purses of consumers,[57] to establish and safeguard orderly marketing conditions [58] and to assure to each area of the country "a sufficient quantity of pure and wholesome milk." [59] The Secretary found that the 1.5 cent location adjustment had brought forth an adequate but not excessive supply of milk throughout Texas.[60] A larger location adjustment, such as that sought by Schepps, would likely raise the price of milk to consumers in Houston and other areas distant from milk-producing regions.[61] It might, too, disturb the intermarket alignment of class I prices, and engender excessive milk shipments into south Texas.[62]

Schepps mounts no attack on the sufficiency of the factual predicate for the Secretary's ultimate finding that the proposed increase in the location adjustment would not serve the policies of the Act.[63] It argues instead that the Secretary lacked power to make such a judgment, and that location adjustments are mandatory and must reflect transportation costs in toto. We think the straightjacket that Schepps thus would place on the Secretary will not fit; the argument simply cannot withstand the force of the plain meaning of Section 8c(4).[64] We agree with the Eighth Circuit that the Secretary may authorize location differentials only to the extent that they are "required to accomplish the broad purposes of the Act," [65] and here, in the Secretary's judgment, they could only be disserved were Schepps to prevail.

## III. TRADE BARRIERS

Schepps further contends that a location adjustment that fails to take full account of transportation costs constitutes a trade barrier violative of Section 8c(5)(G)'s injunction that

[n]o marketing agreement or order applicable to milk and its products in any marketing area shall prohibit or in any

---

**55.** 7 U.S.C. § 608c(4) (1976).

**56.** 7 U.S.C. § 602(1) (1976); H.R.Rep.No.952, 74th Cong., 1st Sess. 1 (1935) ("[t]he primary objective set forth in the declaration of policy in the Agricultural Adjustment Act is to secure parity prices for farm products through balancing production with consumption").

**57.** 7 U.S.C. §§ 602(2), 608c(18) (1976).

**58.** 7 U.S.C. § 602(4) (1976); H.R.Rep.No.2664, 83d Cong., 2d Sess. 19 (1954); United States v. Rock Royal Coop., Inc., supra note 13, 307 U.S. at 572, 59 S.Ct. at 1012, 83 L.Ed. at 1469 (the regulations were "designed . . . to foster, protect and encourage interstate commerce by smoothing out the difficulties of the surplus and cut-throat competition which burdened this marketing" of milk); Dairylea Coop., Inc. v. Butz, supra note 20, 504 F.2d at 84.

**59.** 7 U.S.C. § 608c(18) (1976).

**60.** 40 Fed.Reg. 20024 (1975).

**61.** This assuredly would be the case if the increased costs of Houston handlers were passed on to consumers of their milk.

**62.** 40 Fed.Reg. 20034 (1975).

**63.** In its principal brief in this court, Schepps frames the location-adjustment issue as a matter purely of law. Brief for Appellant at 4,

18–19. In its reply brief, however, Schepps questions the sufficiency of the record evidence supporting the Secretary's decision on the location adjustment. Reply Brief for Appellant at 8–11. Assuming arguendo that despite Schepps' tardiness this issue should be considered, Schepps' position is wholly unacceptable. See Schepps Dairy, Inc., supra note 2, at 9–26, J. App. 505–522.

**64.** 7 U.S.C. § 608c(4) (1976), quoted in part text supra at note 55.

**65.** Sunny Hill Farms Dairy Co. v. Hardin, 446 F.2d 1124, 1130 (8th Cir. 1971), cert. denied, 405 U.S. 917, 92 S.Ct. 940, 30 L.Ed.2d 786 (1972). We do not think that footnote 12 in Zuber v. Allen, supra note 10, 396 U.S. at 179–180 n.12, 90 S.Ct. at 321 n.12, 24 L.Ed.2d at 352–353 n.12, supports Schepps' reading of the statute. There the Court in passing referred to a zone system that undercompensated distant handlers, and suggested that this bolstered its suspicion that the nearby location differentials involved in that case were really designed to compensate nearby suppliers for their greater share of fluid milk sales. The case at bar is devoid of any challenge to the justification for a location differential, and features instead a claim that the location differential formulated should have been larger in amount.

manner limit, in the case of the products of milk, the marketing in that area of any milk or product thereof produced in any production area in the United States.[66]

This provision has been authoritatively construed by the Supreme Court.[67] Under review was a provision in milk-marketing orders for the New York-New Jersey area requiring handlers purchasing milk outside the area and then bringing it "into the region for sale as fluid milk to pay to the farmers who suppl[ied] the region a fixed amount as a 'compensatory payment.'"[68] The payment was assessed against these outside milk-marketing companies because they were not fully regulated and thus were free to purchase milk below the Secretary's minimum prices.[69] After canvassing the legislative history of Section 8c(5)(G),[70] the Court concluded that the provision was designed to prevent the Secretary from establishing economic barriers that would effectively prohibit outside milk from competing with pool milk,[71] or would "tend to limit" the marketing, within the area covered by the order, of milk products manufactured outside the area.[72] Finding that the

compensatory payment provision imposed "almost insuperable trade restrictions on the entry of nonpool milk into a marketing area,"[73] the Court held it invalid under Section 8c(5)(G).

■ That decision, treating as it did a situation completely foreign to that confronting us here, affords no haven to Schepps in its present position. As the Supreme Court has made clear, Section 8c(5)(G) is addressed primarily to obstacles to the marketing in one area of milk or milk products produced in another area, and we think the section is simply irrelevant in the circumstances of the case before us. Schepps is primarily contesting the Secretary's selection of an *intra-market* location adjustment, not any economic barrier to entry of outside milk or its products.[74] That adjustment, we have held, is explicitly authorized by Section 8c(5)(A) and is fully warranted by the conditions prompting the Secretary to make it.[75] We accordingly reject Schepps' contention that the intra-market adjustment soundly bottomed on Section 8c(5)(A) transgresses Section 8c(5)(G)'s proscription on trade barriers.[76]

66. 7 U.S.C. § 608c(5)(G) (1976).

67. *Lehigh Valley Coop. Farmers, Inc. v. United States*, 370 U.S. 76, 82 S.Ct. 1168, 8 L.Ed.2d 345 (1962).

68. *Id.* at 77, 82 S.Ct. at 1169, 8 L.Ed.2d at 347.

69. *Id.* at 84, 82 S.Ct. at 1172–1173, 8 L.Ed.2d at 351. See *Lewes Dairy, Inc. v. Freeman*, 401 F.2d 308, 313 (3d Cir. 1968), *cert. denied*, 394 U.S. 929, 89 S.Ct. 1187, 22 L.Ed.2d 455 (1969).

70. *Id.* at 91–97, 82 S.Ct. at 1177–1180, 8 L.Ed.2d at 355–358.

71. *Id.* at 97, 82 S.Ct. at 1180, 8 L.Ed.2d at 358.

72. *Id.* See also *Polar Ice Cream & Creamery Co. v. Andrews*, 375 U.S. 361, 379, 84 S.Ct. 378, 388, 11 L.Ed.2d 389, 400 (1964) (§ 8c(5)(G) "was intended to prevent the Secretary of Agriculture from setting up trade barriers to the importation of milk from other production areas in the United States"); *Lewes Dairy, Inc. v. Freeman, supra* note 69, 401 F.2d at 315 (§ 8c(5) "was designed to insure that no regulation would be promulgated placing a greater burden on outside milk and milk products entering the market than was placed on milk and its products within the market[;] [t]hus the

Secretary in his efforts to protect a particular market may require no more than equal treatment of pool and non-pool milk").

73. *Lehigh Valley Coop. Farmers, Inc. v. United States, supra* note 67, 370 U.S. at 98, 82 S.Ct. at 1180, 8 L.Ed.2d at 359.

74. See notes 34–38 *supra* and accompanying text. To the extent that Schepps' argument extends further to one of the inter-market barriers, it is sufficient to note that the current 1.5 cent-location adjustment imposes on Schepps—a regulated handler within the Texas marketing area—no limitation on outside milk or milk products brought into that area which is not already applicable to milk and milk products produced within the area.

75. See Part II *supra*.

76. See *Dairylea Coop., Inc. v. Butz, supra* note 20, 504 F.2d at 88; *Sunny Hill Farms Dairy Co. v. Hardin, supra* note 65, 446 F.2d at 1131 (the location differential "is specifically authorized by the Act and reasonable under the circumstances of the case[;] [i]t thus cannot be construed as establishing an illegal trade barrier").

## IV. CURRENT MARKETING PERIOD

Under Section 8c(16)(B) of the Act,[77] the Secretary must terminate a marketing agreement or order upon finding that action favored by a majority of the regulated dairy farmers, provided they produce more than half of the specific commodity yielded by the area.[78] An order of termination is not to become effective immediately upon discovery of the producers' sentiments, however, but only "at the end of the then current marketing period for such commodity, specified in such marketing agreement or order . . . ."[79] To this extent, Section 8c(16)(B) contrasts with Section 8c(16)(A), which instructs the Secretary to abrogate forthwith any order or provision of an order that "does not tend to effectuate the declared policy of this chapter . . . ."[80]

Prior to the litigation now under review, the Secretary never included a definition of "current marketing period," for purposes of Section 8c(16)(B) termination, in his milk-marketing orders.[81] Schepps, concerned with the possible economic effects of rapid, unanticipated deregulation, requested that the marketing period be defined as "the fiscal year beginning April 1 and ending on March 31,"[82] and that termination "not be permitted unless announced at least 90 days prior to the end of the current marketing period."[83] Thus, under Schepps' proposal, an area could remain regulated for many months after notification of the producers' desire to deregulate.

On the other hand, a producer-cooperative interested in assuring producer flexibility sought definition of the marketing period as "a calendar month or portion thereof."[84] As we have noted, the Secretary reckoned that since milk is produced and sold on a continuous basis no true "marketing period" could be ascertained.[85] He decided nevertheless that fairness to the industry required some advance notice and that a period of one month would accord with long-standing regulatory and accounting practices under federal milk-marketing orders.[86] He therefore ruled that termina-

77. 7 U.S.C. § 608c(16)(B) (1976).

78. *Id.*

79. *Id.*

80. 7 U.S.C. § 608c(16)(A) (1976).

81. See 40 Fed.Reg. 20036 (1975); *Marketing Assistance Program, Inc. v. Butz, supra* note 40, *aff'd sub nom. Marketing Assistance Program, Inc. v. Bergland, supra* note 40.

82. 40 Fed.Reg. 20036 (1975).

83. *Id.*

84. *Id.*

85. See note 43 *supra* and accompanying text. See also note 86 *infra*.

86. The Secretary said:

Milk is produced and marketed by dairy farmers on a continuous basis. Although the normal lactation period of a cow is about 300 days, the "dry" periods within a herd are customarily staggered. Thus, each dairy farmer has a continuing daily production of milk. Because of its highly perishable nature, such milk must be delivered within a day or two to plants for processing, the particular delivery schedule usually being dependent upon the storage capacity at the farm.

In view of this daily and continuous character of milk production and marketing, there is no well-defined marketing period for milk. Since the inception of Federal milk orders in the 1930's, however, milk has been accounted and paid for under the regulatory program on a monthly basis. At the end of each month, handlers are required to report all receipts of producer milk and make final payment therefor in accordance with the utilization of the milk during the month. Each successive month constitutes, in effect, a new marketing period for the producer and the handler. The consistent administration of milk orders on this basis over many years suggests that a defined marketing period of any duration other than a month would be totally inconsistent with long-standing regulatory practice in the fluid milk industry. 40 Fed.Reg. 20036 (1975).

Schepps attempts to counter this reasoning by adverting to the federal milk price-support program, which traditionally has been reviewed and revised on an annual basis. See J. App. 407–437 (materials on price-support program). As the Secretary has noted, however, the price-support program involves a different statute, 7 U.S.C. § 1446 (1976), as amended by Pub.L. No. 95–113, 91 Stat. 920 (Sept. 29, 1977), with different regulatory objectives. Brief for Appellee at 54–55.

tion pursuant to Section 8c(16)(B) would be effected at the end of the first full monthly period following notice, thus assuring that the industry would have 30 to 60 days notice of an area's impending deregulation.[87]

Schepps challenges the Secretary's designation of the one-month current marketing period on the ground of inadequate record support. As we have seen, Section 8c(4) ordains that each provision in a milk-marketing order must effectuate the policies of the Act.[88] That section also directs that that determination be based on the evidence adduced at a hearing,[89] and this instruction has consistently been interpreted to mean that the factual predicate for the order must be grounded in substantial record evidence.[90]

■ In our view, Schepps' position is without merit. Schepps has no real quarrel with the Secretary's assessment of standard regulatory practices, nor with the basic fact that milk production and marketing occur on a continuous year-round basis. To require, as Schepps advocates, that an agen-

cy's long-standing and well known regulatory and accounting procedures be placed in evidence before the agency may take cognizance of them would be to mandate a most sterile formality.[91] And for an agency to take notice of the indisputable, commonly known fact that the dairy industry is not characterized by seasonal production or marketing periods is nowise inconsistent with the substantial evidence rule.[92]

In truth, the Secretary's choice of a current marketing period of one month rested on policy considerations. To be sure, he gave predominant weight to protection of the producer-majority's statutory freedom of choice, but he did not entirely sacrifice the interests of others in an orderly transition to deregulation. Schepps has vigorously attacked the balance struck by the Secretary, but his action undeniably was the product of reasoned decisionmaking,[93] given that the Act's principal thrust is to impose regulation for the benefit and only at the will of producers.[94]

---

**87.** 40 Fed.Reg. 20036 (1975).

**88.** See notes 55–65, *supra* and accompanying text.

**89.** 7 U.S.C. § 608c(4) (1976).

**90.** See, *e. g., Fairmont Foods Co. v. Hardin, supra* note 24, 143 U.S.App.D.C. at 45, 442 F.2d at 767; *Lewes Dairy, Inc. v. Freeman, supra* note 69, 401 F.2d at 315; *Borden, Inc. v. Butz, supra* note 47, 544 F.2d at 316; *Jones v. Bergland,* 456 F.Supp. 635, 646 (E.D.Pa.1978). See generally, 5 U.S.C. § 706(2)(E) (1976). In light of our holding today that the Secretary's action passes muster under the substantial evidence rule, we need not consider whether these cases have been undermined by our recent decision in *Marketing Assistance Program, Inc. v. Bergland, supra* note 40, 183 U.S.App.D.C. at 359–361, 562 F.2d at 1307–1309 (milk marketing orders are "really instances of notice and comment rulemaking").

**91.** See, *e. g., Memphis Light, Gas & Water Div. v. FPC,* 163 U.S.App.D.C. 130, 135, 500 F.2d 798, 803 (1974); *Alabama-Tennessee Natural Gas Co. v. FPC,* 359 F.2d 318, 336–339 (5th Cir.), *cert. denied,* 385 U.S. 847, 87 S.Ct. 69, 17 L.Ed.2d 78 (1966); *cf. Public Sys. v. FERC,* 196 U.S.App.D.C. 66, 74, 606 F.2d 973, 981 (1979).

**92.** See cases cited *supra* note 91. See also *McDaniel v. Celebrezze,* 331 F.2d 426 (4th Cir. 1964).

**93.** "The paramount objective is to see whether the agency, given an essentially legislative task to perform, has carried it out in a manner calculated to negate the dangers of arbitrariness and irrationality in the formulation of rules for general application in the future." *Automotive Parts & Accessories Ass'n v. Boyd,* 132 U.S.App.D.C. 200, 208, 407 F.2d 330, 338 (1968). See also *Marketing Assistance Program, Inc. v. Bergland, supra* note 40, 183 U.S. App.D.C. at 359–361, 562 F.2d at 1307–1309 (milk marketing orders are "really instances of notice and comment rulemaking").

**94.** See notes 55–59 *supra* and accompanying text. The purpose of what is now § 8c(16)(B) was elucidated by C. C. Davis, Agricultural Adjustment Administrator, at a congressional hearing on the 1935 amendments to the Agricultural Adjustment Act:

The termination of any marketing agreement or license would be required if termination is favored by a majority of the producers concerned; that is, while you put into effect a certain marketing plan and in that case require the support of two-thirds of the producers, the pending amendment provides that the marketing agreement and license must be terminated if one-half or more of the producers affected favor its termination. This is a limitation on the Secretary's authority. It completes the assurance that the farmers will keep control over their own affairs, in any allotment or quota plans.

The District Court correctly held that the Secretary's 1975 order was "in accordance with law" [95] and that no material facts were in dispute. It follows that the award of summary judgment to the Secretary must be

*Affirmed.*

WILKEY, Circuit Judge, dissenting.

I regret that I am unable to concur in my colleagues' views herein. In brief, my view is that although the Secretary has considerable discretion in setting the minimum price for the zone, the three adjustments which the statute calls for him to make as to the minimum price are each based on ascertainable factors. Thus the transportation cost adjustment is to be based on the ascertainable transportation cost, and demonstrable deviations from a measure of real cost are impossible.

Hearings on H.R. 5585 before the House Committee on Agriculture, 74th Cong., 1st Sess. 16 (Feb. 26, 1935). And in summing up, the witness reiterated "that the amendments are so drawn as to make sure that the farmers' wishes will govern in marketing plans . . . ." *Id.* at 17.

